**LOCKHEED MARTIN CORPORATION,**
Plaintiff,

v.

**The BOEING COMPANY, William Erskine, Kenneth Branch, and Larry Satchell, Defendants.**

**No. 6:03–cv–796–Orl–28KRS.**

United States District Court,
M.D. Florida,
Orlando Division.

April 23, 2004.

Terry C. Young, Michael V. Elsberry, Kevin K. Ross, Lowndes, Drosdick, Doster, Kantor & Reed, P.A., Orlando, FL, for plaintiff.

David B. King, Mayanne Downs, Thomas A. Zehnder, King, & Associates, Winter Springs, FL, Darryl M. Bloodworth, Nichole M. Mooney, Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, Blackwell & Downs, P.A., Orlando, FL, Kristin Linsley Myles, Munger, Tolles & Olson, San Francisco, CA, Brad D. Brian, Dennis C. Brown, Marc A. Becker, Munger, Tolles & Olson LLP, Los Angeles, CA, Gerry S. Gibson, Traci H. Rollins, Steel, Hector & Davis, West Palm Beach, FL, Thomas J. Pilacek, Thomas J. Pilacek & Associates, Winter Springs, FL, Robert L. Corbin, Michael W. Fitzgerald, Corbin & Fitzgerald LLP, Los Angeles, CA, for defendant.

Thomas J. Pilacek, Thomas J. Pilacek & Associates, Winter Springs, FL, for cross-claimant.

David B. King, Mayanne Downs, King, Blackwell & Downs, P.A., Orlando, FL, Kristin Linsley Myles, Munger, Tolles & Olson, San Francisco, CA, Brad D. Brian, Dennis C. Brown, Marc A. Becker, Munger, Tolles & Olson LLP, Los Angeles, CA, for cross-defendant.

## MEMORANDUM AND ORDER

ANTOON, District Judge.

Lockheed Martin has filed a twenty-three count Complaint against the Boeing Company and certain individuals related to their alleged theft of trade secrets pertaining to a bid competition to provide the U.S. Government space launch capability. Defendants the Boeing Company, William Erskine, Larry Satchell, and Kenneth Branch have all filed motions to dismiss several of the counts of Lockheed Martin's Complaint for failure to state a claim. Specifically, Defendants seek dismissal of all of the claims pursuant to the Racketeer Influenced and Corrupt Organizations Act and the Florida Civil Remedies For Criminal Activities Act stated in Counts I—IV ("the racketeering claims" and the "racketeering conspiracy claims") and of all of the claims brought under the Sherman Act and the Florida Antitrust Act of 1980 stated in Counts V—VIII (the "attempted monopolization claims" and the "conspiracy to monopolize claims"). William Erskine's motion also seeks a more definite statement from Lockheed.[1] This memorandum and order supplement the Court's order of March 31, 2004. (Doc. 189, filed March 31, 2004.)

### I. BACKGROUND[2]

Lockheed Martin ("Lockheed") is a company heavily involved in the defense and aerospace industries, including satellite launch services. The Boeing Company ("Boeing") competes with Lockheed in the satellite launch services business. This competition extended to the multi-billion dollar Evolved Expendable Launch Vehicle ("EELV") Program, an Air Force program

---

1. Defendants also challenged Count IX of the Complaint, which alleged violations of the Federal Procurement Act. A prior Order of this Court dismissed the claims in that Count. (Doc. 109, filed October 29, 2003.)

2. These are the facts as alleged in Lockheed Martin's Complaint. (Doc. 1.)

seeking assistance from the private sector to develop a cost-efficient national space launch capability. The Air Force contemplated that interested aerospace contractors would engage in a multi-phased competition covering the design, development, and prototyping of the EELV. Initially, the Air Force planned to select the contractor that submitted the proposal representing the "best value" to the Air Force in a "winner take all" competition. The winner was to be awarded $1 billion for the development cost of the EELV as well as contracts for future space launches.

The first phase of the competition was called the "Low Cost Concept Validation" ("LCCV") and it required competitors to develop cost and risk reduction concepts. On August 24, 1995, the Air Force awarded LCCV contracts to four contractors: Lockheed, Boeing, McDonnell Douglas, and Alliant Techsystems. The Air Force agreed to pay each competitor $30 million for its participation.

The Air Force then called upon the participating companies to submit proposals for the next phase of the competition, which was called "Pre–Engineering and Manufacturing Development" ("Pre–EMD"). The proposals were required to show at least a twenty-five percent savings over current launch costs. On December 20, 1995, after receiving the proposals, the Air Force eliminated two of the competitors, Alliant Techsystems and Boeing, and awarded Pre–EMD contracts to Lockheed and McDonnell Douglas. Approximately eight months later, Boeing re-entered the competition when it acquired McDonnell Douglas.

On November 3, 1997 the Air Force changed its acquisition policy by abandoning the "winner take all" approach. The Air Force announced that, instead, it would award each of the two remaining competitors—Lockheed and Boeing—$500 million Engineering, Manufacturing and Development contracts ("the EMD contracts"). The EMD contracts awarded to Lockheed and Boeing required that they each develop the engineering and manufacturing process for the "launch vehicle system, launch pads, satellite interfaces, and support infrastructure." The contracts required each of the competitors to demonstrate that its system was capable of launching commercial satellites as well as meeting the Air Force's launch mission requirements.

Also under the new Air Force strategy, the contractors were expected to submit firm, fixed-price bids for the initial thirty launch missions. Information generated by the bidders in the earlier phases of the bid remained relevant to the final award. Believing the winning contractor would enjoy "an enhanced position in the national and international commercial space launch vehicle market from [Department of Defense's] investment in the program," the Air Force also required each contractor to make a financial investment in the new technology.

At the end of the Pre–EMD phase, the Air Force requested that Lockheed and Boeing submit separate proposals for EMD contracts and Launch Services contracts. The Air Force advised the contractors that its allocation of the initial thirty launch missions would be based on which company's proposal would provide the best value to the Air Force. On October 16, 1998, much to Lockheed's disappointment, the Air Force awarded nineteen of the first twenty-eight initial Launch Services contracts to Boeing and only nine to Lockheed. Additionally, the first seven of the Launch Services contracts went to Boeing, while Lockheed's first launch contract was not to take place until the fourth fiscal year of the EELV program. In making this uneven allocation, the Air Force took into account Boeing's lower proposed

price, Boeing's lower evaluated risk in several assessment categories, and the Air Force's determination that Boeing's proposal was technically equivalent to Lockheed's proposal. These were factors contributing to the Air Force's assessment as to which company offered the "best value." The Air Force is now considering expanding the EELV program from thirty to fifty launches within the next ten to twelve years. Lockheed believes the original disproportionate allocation places it at a distinct disadvantage in competing for future Launch Services contracts.

All three of the individual Defendants are former Boeing employees. Kenneth Branch ("Branch") began work with General Dynamics, Lockheed's predecessor, at Cape Canaveral, Florida in 1989, and stayed on when Lockheed took over. He worked on the Atlas I and Atlas II launches and continued to be assigned to Lockheed facilities at Cape Canaveral or Kennedy Space Center until he terminated his employment with the company on January 29, 1997.

In May 1995, Lockheed temporarily assigned Branch to Lockheed's Denver facility to assist with the company's LCCV proposal. Because of his experience with the Atlas II, which was the starting point for the EELV design concept, Branch was again asked to assist with the EELV proposal team at the Denver facility from October 1995 to August 1996. During his second assignment to the Denver facility, Branch was a member of the Operations Group and focused on cost data and on reduction of launch vehicle processing time at the launch site. While performing this work for Lockheed, Branch had access to sensitive Lockheed proprietary documents.

In August 1996, about the time Lockheed was completing its Pre–EMD proposal, Branch returned to Florida to find that his position with Lockheed had been eliminated. He maintained a position with the

company as a consultant to the EELV team in Denver, however, while he sought another position. On November 3, 1996, Branch accepted a position with Lockheed's Reusable Launch Vehicle program in Florida. On January 14, 1997, Branch gave Lockheed two weeks' notice of his intention to leave and resigned effective January 29, 1997. Surprisingly, he began employment with Boeing on January 28, 1997, the day before his employment with Lockheed ended. Branch continued to work for Boeing until August 2, 1999, when he was terminated for violating Boeing policy by possessing and distributing Lockheed EELV-related proprietary documents during the EELV competition—the conduct that ultimately gave rise to this suit.

Lockheed alleges that as early as August 1996, when it was finalizing its Pre–EMD proposal, Branch traveled to Boeing's facilities in Huntington Beach, California to be interviewed by Boeing employees Tom Alexiou ("Alexiou") and William Erskine ("Erskine") regarding possible employment with Boeing. Mr. Alexiou was Boeing's EELV Infrastructure Team Lead and Erskine was Boeing's EELV Ground Operations Lead. At this meeting, Branch allegedly showed Erskine Lockheed documents including a presentation entitled "EELV Launch Operations Cycle Time Reduction," a document that contained trade secrets and was marked as Lockheed property. This document described Lockheed's strategy for reduction of costs and reduction of the time period a launch vehicle must remain on a pad in preparation for a flight. During the meeting, Mr. Alexiou questioned Branch regarding elements of Lockheed's EELV proposal, including engines and performance. Branch disclosed Lockheed's plan for reducing costs of its EELV program and gave the two Boeing employees other Lockheed documents. While still em-

ployed by Lockheed and prior to being hired by Boeing, Branch had at least two other meetings with Boeing employees assigned to the EELV program.

On January 14, 1996 Boeing offered Branch a position on Boeing's EELV proposal team. Branch immediately accepted the offer and Branch began work on January 28, 1997. When Branch joined the Boeing EELV proposal team, Boeing officials then questioned him about his work with the Lockheed EELV program. At one point Mr. Alexiou, introducing Branch to Tom Parkinson, Boeing's Vice-President, and to program managers, described Branch as a former Lockheed employee who knew the details of Lockheed's EELV program. Boeing officials questioned Branch regarding Lockheed's proprietary and trade secret information, including strategy, cost, and other information relevant to Lockheed's EELV proposal.

On February 19, 1997, Branch returned to Huntington Beach, where he met with Boeing's EELV Capture Team. A short time later he was assigned on paper to Mr. Alexiou's office in Huntington Beach even though his office was actually in Florida. According to Lockheed, Branch made forty-three trips to Huntington Beach to provide Boeing with Lockheed proprietary information and trade secrets. Boeing promoted Branch to the position of Ground Command Control & Communication Mechanical Equipment Lead in charge of sixty employees responsible for developing the electrical ground support system for EELV launches.

After starting with Boeing, Branch spent time with Larry Satchell ("Satchell"), Boeing's EELV Program Manager of Strategic Planning and Analysis. Lockheed charges that Satchell's position with Boeing was also known as the "Black Hat Team Leader" because one of his job responsibilities was to gather information about Lockheed's EELV Program for Boe-

ing's benefit. By speaking with former Lockheed employees, Satchell attempted to discover technical and cost aspects of Lockheed's EELV proposal. This information was sought to give Boeing a better chance of proposing a lower price to the Air Force. Satchell had numerous conversations with Branch regarding Lockheed's EELV program, and Branch gave him Lockheed proprietary and trade secret information, including cost data.

Kimberly Tran, a Boeing software engineer, became alarmed upon seeing Branch in possession of a binder containing Lockheed proprietary materials while on the Boeing premises at Huntington Beach. Ms. Tran reported the incident to her Boeing supervisors. When Mr. Alexiou learned of Ms. Tran's report he told her she should have made the report to him instead of to her supervisors. Mr. Alexiou maintains that Boeing conducted an investigation in response to Ms. Tran's report and the investigation cleared Branch of wrongdoing. Boeing has since admitted, however, that there is no record of the investigation.

In June of 1999, Steve Griffin, a Boeing engineer, heard Erskine boast that he had offered Branch the Boeing job in exchange for the Lockheed EELV proposal. Mr. Griffin reported these remarks made by Erskine to the Boeing Human Resources Representative and the Boeing Delta IV launch site manager. Coincidentally, Mr. Griffin's wife, Bridget Griffin, was an engineer with Lockheed at this time and made a similar report outlining Erskine's remarks to a Lockheed ethics officer. Lockheed contends that, when Mr. Griffin made his report, Boeing became aware that it could no longer conceal the fact that Boeing had received proprietary information and trade secrets. Only then did Boeing report the situation to Boeing's lawyer, Mark Rabe.

Mr. Rabe began his investigation of the report by speaking to Mr. Griffin, who repeated what Erskine had told him. Erskine allegedly said that Branch had come to Erskine and offered him the entire Lockheed EELV proposal to assist Erskine in preparing Boeing's EELV proposal. Erskine also told Mr. Griffin that he had told Branch that if Boeing were not eliminated from the competition, Branch would have a job with Boeing in return for the Lockheed information. Indeed, as soon as the Air Force selected Lockheed and Boeing for the final phase of the competition, Boeing hired Branch. Erskine added that the documents delivered by Branch assisted Boeing in explaining weaknesses in Lockheed's proposal to the Air Force. When Mr. Griffin suggested to Erskine that his conduct was unethical, Erskine replied that he did not care because he had been hired to win the bid and he would do whatever it took to do so.

Mr. Rabe interviewed Branch in June and July 1999. Upon questioning by Mr. Rabe, Branch disclosed a stack of Lockheed documents located in his office and admitted that they were Lockheed property. After this disclosure, Branch was suspended pending further investigation. After the suspension, other Lockheed documents, marked "proprietary," were found in Branch's office, including one marked "Satchell EELV Observations." Mr. Rabe also interviewed Erskine, who confirmed that he had been part of the Boeing EELV team when he met with Branch in August 1996.

Lockheed alleges that by the end of June 1999 Boeing was aware of the facts outlined above. Notwithstanding this knowledge, Boeing intentionally and fraudulently withheld this information from Lockheed and the Air Force to protect Boeing's interest in the EELV program. Lockheed maintains that in continuing the cover-up, Boeing's in-house lawyer, Gary Black, telephoned Lockheed's Deputy General Counsel, Stephen E. Smith, on June 29, 1999 and said that he had just learned that Boeing had hired Branch, who had brought two Lockheed documents dated 1996 to Boeing. Mr. Black told Mr. Smith that Boeing had suspended Branch. Mr. Black added that there was no indication that the two documents in Branch's possession had been seen or used by anyone on Boeing's EELV proposal team. Upon Mr. Smith's request, Mr. Black also spoke to Michael Kramer, General Counsel of Lockheed Astronautics. Mr. Black repeated his understated assessment of the facts to Mr. Kramer and assured him that none of the information from Branch had been seen by Boeing personnel or used in preparing Boeing's EELV proposal. Relying on the representations that only two documents had been found and that they had not been seen by Boeing EELV personnel, Lockheed did not take action at that time.

On November 1, 1999, Mr. Black again called Mr. Kramer to inform him that another fifteen Lockheed documents possibly containing proprietary and trade secret information were in Boeing's possession. Despite what had been gleaned from the Boeing internal investigation, Mr. Black represented that the documents were all dated earlier than 1996, that they had not been out of Boeing's Florida office, and that they had not been seen by anyone on Boeing's EELV proposal team. In this conversation Mr. Black assured Mr. Kramer that Branch was a "first line engineer" and that he was not involved with Boeing's EELV proposal team.

The fifteen documents Mr. Black referred to were sent to Lockheed. Upon receipt, the documents were inspected and fourteen were found to have been proprietary and confidential. Nonetheless, based on the foregoing assurances from Mr.

Black that the documents had not been seen by the EELV proposal team, Lockheed continued to believe it had not been injured.

After Mr. Black's last conversation with Mr. Kramer, Boeing fired Branch and Erskine. Thereafter, Branch and Erskine initiated an action against Boeing for wrongful termination ("the Erskine litigation"). During that litigation, a lawyer for Boeing contacted Lockheed to advise that, as evidence of Erskine and Branch's misconduct, Boeing was prepared to file a box of Lockheed documents that "might be proprietary." Boeing asserted along with the submission that it had found the box in Branch's office in June or July of 1999. These documents detailed Lockheed's specific cost estimates and pricing strategies, including labor plans and cost-cutting measures, for Lockheed's EELV proposal. The documents also made it possible for Boeing to direct its efforts toward developing technology that it had not previously possessed. The documents, furthermore, revealed that Boeing had hired Branch because of his access to Lockheed's proprietary and trade secret information. Though it was not a party in the Erskine litigation, Lockheed sought review of documents filed with the court in connection with that case, but Boeing objected on grounds that the documents were protected from inspection by order of court. Lockheed's motion to review the documents in the Erskine litigation was denied.

In March 2002, Valerie Schurman, Boeing Vice President and Assistant General Counsel, wrote to Lockheed and stated that she could not explain why all the documents obtained from Mssrs. Erskine and Branch had not been sent to Lockheed in 1999. Ms. Schurman concluded, "At any rate, all documents have now been transmitted to you and I would like to apologize for the series of errors that have occurred in handling this case." Notwithstanding this representation, in April of 2002, Boeing issued an "Investigative Report" stating that it "possessed approximately two boxes of Lockheed documents." In May 2002, Mr. Smith asked Ms. Schurman to confirm that Boeing possessed only the two boxes of Lockheed documents mentioned earlier. Confirming her earlier report, Ms. Schurman replied: "On your question about documents, I think we've answered that a number of times. We have provided you with all Lockheed documents of which we are aware." This, too, turned out to be incorrect.

On April 23, 2003, while the Air Force was conducting an investigation of Boeing, Steven Horton, Boeing's Chief Counsel at its Seal Beach, California office, admitted to Mr. Smith, Lockheed's counsel, that Boeing had ten additional boxes of Lockheed documents, three or four of which might contain Lockheed proprietary information and one or two of which might contain trade secrets belonging to Lockheed's predecessors, including General Dynamics. Mr. Horton explained that the documents had been removed from Branch's office and that Boeing's Law Department believed the relevant documents had been turned over to Lockheed. Mr. Horton assented to Mr. Smith's request for the documents. On April 24, 2003, Lockheed received nineteen documents, eighteen of which contained Lockheed or General Dynamics proprietary markings. Included in the documents were the detailed launch operations plan for Lockheed's EELV launch vehicle and an internal strategic plan containing cost estimates. On April 26, 2003, Boeing sent eleven more boxes of Lockheed documents to Lockheed's outside counsel. Those boxes also contained Lockheed proprietary and trade secret information.

Boeing continued to produce Lockheed documents in its possession. On May 9

and May 23, 2003, Boeing sent Lockheed another four boxes of Lockheed proprietary and trade secret information. On June 2, 2003, Boeing turned over copies of two e-mail messages from Branch to another Boeing employee attaching Lockheed proprietary documents. On June 4, Boeing surrendered another 1,850 pages of Lockheed documents, and finally, on June 6, 2003 Boeing advised Lockheed that it had still more Lockheed documents in its possession. By the time the Complaint in this case was filed on June 10, 2003, Boeing had turned over 37,173 pages of Lockheed documents.

## II. MOTION FOR A MORE DEFINITE STATEMENT

Erskine describes Lockheed's Complaint as a "shotgun pleading" and seeks a more definite statement from Lockheed under Federal Rule of Civil Procedure 12(e). (Doc. 55 at 2.) A court should not grant a Rule 12(e) motion unless the pleading in question is "so vague that a party cannot reasonably be required to frame a responsive pleading." *Fed.R.Civ.P.* 12(e); *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.,* 77 F.3d 364, 367 (11th Cir. 1996). The Eleventh Circuit Court of Appeals refers to the most vague pleadings as "shotgun pleadings." One typical feature of a shotgun pleading is incorporation of the same lengthy allegations into each claim alleged, which makes it difficult "to know which allegations of fact are intended to support which claim(s) for relief." *Anderson,* 77 F.3d at 366. Lockheed's Complaint is not a shotgun pleading. Lockheed does repeatedly incorporate into each Count all of the general allegations in paragraphs 1–168. In each Count, however, Lockheed also reiterates in detail the particular relevant portions of those general allegations. Erskine was able to and did file adequate responsive motions to this Complaint. For these reasons, Erskine's motion for a more definite statement is denied.

## III. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

For purposes of a motion to dismiss, a court must view the allegations of the complaint in the light most favorable to the plaintiff. *Fed R. Civ. P.* 12(b)(6); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Jackson v. Okaloosa County, Fla.,* 21 F.3d 1531, 1534 (11th Cir.1994). Furthermore, a court must accept all reasonable inferences from the complaint and consider all allegations as true. *Id.* A court may not, however, accept conclusory allegations and unwarranted factual deductions as true. *Gersten v. Rundle,* 833 F.Supp. 906, 910 (S.D.Fla. 1993) (citing *Associated Builders, Inc., v. Ala. Power Co.,* 505 F.2d 97, 100 (5th Cir.1974)). Only pleadings and attached written exhibits may be considered in making these determinations. *See Fed. R.Civ.P.* 10(c); *GSW, Inc., v. Long County, Ga.,* 999 F.2d 1508, 1510 (11th Cir. 1993). Unless it appears beyond doubt that a plaintiff can prove no set of facts entitling him to relief, a complaint should not be dismissed for failure to state a claim. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Hunnings v. Texaco, Inc.,* 29 F.3d 1480, 1484 (11th Cir.1994). "Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases." *Covad Communications Co. v. BellSouth Corp.,* 299 F.3d 1272, 1279 (11th Cir.2002).

A plaintiff is "entitled to survive a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6) if there is any set of facts that, if proven at trial, would entitle [it] to recover." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 551 n. 8, 103 S.Ct. 897, 74

L.Ed.2d 723 (1983). A court may not assume, however, that a plaintiff can prove facts that it has not alleged or that a defendant has violated laws in ways that have not been alleged. *Id.* at 526, 103 S.Ct. 897; *Beck v. Interstate Brands Corp.,* 953 F.2d 1275, 1276 (11th Cir.1992) (per curiam). Nor is the court bound to accept as true a legal conclusion couched as a factual allegation. *See B.H. Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Although the federal rules embrace a liberal pleading standard, bald assertions and conclusions of law will not defeat a properly supported motion to dismiss. *See Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996).

## IV. THE RACKETEERING CLAIMS

In Counts I—IV of the Complaint, Lockheed alleges that it is entitled to civil damages because the Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Florida Civil Remedies for Criminal Activities Act ("the Florida RICO Act"). In Count I, Lockheed contends that

Boeing, Erskine, Satchell, Branch, together with Alexiou, Black, and others known and unknown to Lockheed Martin, acting in concert and on behalf of Boeing, have unlawfully, knowingly, and intentionally conducted and are continuing to conduct [through a pattern of racketeering activity] an enterprise referred to herein as the "Boeing Trade Secrets Theft Enterprise," an association in fact. This same enterprise includes, and may not be limited to, the "Boeing EKV Proposal Team," and,

more recently, the "Boeing EELV Proposal team."

(Doc. 1 ¶¶ 175–77.)[3] The proposed Boeing Trade Secrets Theft Enterprise ("BTSTE") allegedly existed to steal trade secrets not only from Lockheed, but also from other competitors, including Raytheon, with whom Boeing competed to win the Missile Defense Agency's EKV contract, and AssureSat. (Doc. 1 ¶¶ 156–63.) Count I is based on section 1962(c) of RICO, which provides that

It shall be unlawful for any *person* employed by or associated with any *enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such *enterprise's* affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C § 1962(c) (2001) (emphasis added); *see* 18 U.S.C. § 1964(c) (providing for private right of action and civil damages).

In Count II, Lockheed alleges that, in violation of section 1962(d) of RICO, the Defendants all conspired to violate section 1962(c). Section 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). In Counts III and IV, Lockheed attempts to state claims under parallel provisions of the Florida RICO Act, sections 772.103(3) and (4) of the Florida Statutes.[4] Lockheed alleges that all of the Defendants are "persons" within the RICO definition because they are entities capable of holding a legal or

---

**3.** "EKV" stands for exoatmospheric kill vehicle. Lockheed alleges that in 1999, Boeing was involved in misconduct pertaining to its involvement in the U.S. Missile Defense Agency's competition for the EKV. (Doc. 1 ¶¶ 156–59.)

**4.** With one exception, addressed in subsection C.2. of this discussion, the parties agree that the Florida RICO Act was modeled after RICO and that their arguments about RICO apply equally to the counterpart state claims. *See Gross v. State,* 765 So.2d 39, 42–43 (Fla. 2000). *(See, e.g.,* Doc. 46 at 4–5 n. 2; Doc. 57 at 2 n. 2.)

beneficial interest in property, and that the BTSTE is an "association-in-fact" enterprise. 18 U.S.C. §§ 1961(3)-(4). In their motions to dismiss, Defendants make several arguments: (1) that the allegations would not support a finding that Lockheed's proposed enterprise, the BTSTE, was an ongoing organization and thus a true "enterprise"; (2) that, in light of the distinctness rule, Boeing may not be liable as a "person" who associated with the BTSTE; (3) that Lockheed has not sufficiently alleged a "pattern of racketeering activity;" and (4) that Lockheed's conspiracy claims necessarily fail if Lockheed has failed to state a sufficient underlying racketeering claim.

### A. The BTSTE as the "Enterprise": RICO & The Florida RICO Act

Defendants argue that Lockheed fails to state a claim under section 1962(c) because the Complaint does not contain allegations that would support a finding that the BTSTE is an association-in-fact enterprise. (*See, e.g.,* Doc. 46 at 9.) Under RICO, an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (2001). The existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Defendants contend that proof of the facts alleged would not support a finding that the BTSTE is an "ongoing organization" in which the "various associates function as a continuing unit" because Lockheed's definition of the enterprise consists "entirely of two Boeing *bid proposal teams,*" which "makes clear that ... the enterprise itself ... ended upon proposal submission, after which the proposal teams by definition ceased to ex-

ist." (Doc. 46 at 9; *see also* Doc. 41 at 5; Doc. 55 at 4.)

Defendants suggest that, under *Turkette,* a plaintiff must allege that an association-in-fact enterprise was made up of a "coherent association of members." (*See, e.g.,* Doc. 46 at 9 n. 7.) This argument, however, was rejected in *United States v. Hewes,* in which the Eleventh Circuit Court of Appeals held that shifting associations can form an enterprise if the participants "overlapped to a significant degree." 729 F.2d 1302, 1311 (11th Cir.1984). The court confirmed this in 1985, when it stated that *Turkette* did not alter the rule that

> [RICO does not require that an] enterprise ... possess an "ascertainable structure" distinct from the associations necessary to conduct the pattern of racketeering activity.... Moreover, [the Eleventh Circuit has also rejected] the contention that *Turkette's* reference to the RICO enterprise as a "continuing unit" required participation of all members throughout the life of the enterprise.

*United States v. Weinstein,* 762 F.2d 1522, 1537 n. 13 (11th Cir.1985). Defendants' arguments hinging on the lack of a "coherent association" are therefore unavailing. Defendants also suggest that under *Turkette,* there must be some organization or purpose distinct from the object of the enterprise's criminal acts. (*See, e.g.,* Doc. 46 at 9–10 n. 7.) The Eleventh Circuit Court of Appeals also rejected this reading of *Turkette* in *Hewes,* in which it held that a plaintiff need not allege "a definable structure distinct from the 'racketeering activity.'" 729 F.2d at 1310.

In this circuit, "the definitive factor in determining the existence of an enterprise [is] an association of individuals, however loose or informal, which furnishes a vehicle for the commission of two or more predicate crimes...." *Weinstein,* 762 F.2d

at 1537. The Court of Appeals has also stated that an enterprise exists if persons "associate formally or informally, with the purpose of conducting illegal activity." *Hewes,* 729 F.2d at 1311, *quoted in Weinstein,* 762 F.2d at 1537.

■ Lockheed's allegations satisfy these very broad definitions of a RICO enterprise. It is true that the focus of Lockheed's Complaint, including the RICO allegations, is the Defendants' conduct with regard to the EELV bid. The allegations about the enterprise, however, do—if only just barely—allege that the BTSTE was ongoing and continuing. The association-in-fact enterprise is, for example, alleged to include members of a proposal team unrelated to the EELV project, the "EKV Proposal Team." This allegation refers to claims in the Complaint that, as "part of a pattern and practice by Boeing to engage in economic espionage," Boeing employees were involved in stealing trade secrets not just from Lockheed, but also from Raytheon (Boeing's competitor in the Missile Defense Agency's EKV competition), and also from AssureSat. (Doc. 1 ¶¶ 156–61.) Both the proposed enterprise and these other allegations suggest that the BTSTE had a life beyond the EELV proposal. Lockheed also alleges that the enterprise members' illegal activity was allegedly geared toward not just the EELV bid, but toward "procuring, analyzing, and using the highly sensitive, proprietary and trade secret information of its competitors, *including, without limitation,* Lockheed Martin." (Doc. 1 ¶ 175) (emphasis added.) These allegations add to the implication that winning the EELV bid was only "one

ostensible purpose" of the BTSTE and that Lockheed will attempt to prove that the enterprise existed to continually steal from several or all of Boeing's competitors.[5] *(See id.)* Lockheed has thus sufficiently alleged a RICO enterprise. Whether Boeing may be held liable as a defendant "person" who "associated with" that ongoing and continuing enterprise also requires discussion.

### B. Boeing as a "Person": RICO & The Florida RICO Act

#### 1. 18 U.S.C. § 1962(c) & Section 772.103(3), Fla. Stat.

■ Boeing challenges the allegations that it is a RICO defendant "person" who associated with the alleged enterprise, the BTSTE. The BTSTE, again, is alleged to "include[ ], and may not be limited to, the 'Boeing EKV Proposal Team,' and, more recently, the 'Boeing EELV Proposal team.'" (Doc. 1 ¶¶ 175–77.) Boeing concedes that a corporation may be a "person" under section 1961(3),[6] but argues that the Boeing corporation is not sufficiently distinct from the enterprise as alleged. Because of the lack of distinctness between it and the alleged enterprise, Boeing urges that it cannot be a defendant "person" and that dismissal of the RICO claims against it is required.

Under section 1962(c), the allegations "must name a RICO person distinct from the RICO enterprise." *United States v. Goldin Indus.,* 219 F.3d 1268, 1271 (2000) *("Goldin I ").* This is because "the plain language of § 1962(c) envisions two sepa-

---

**5.** It is true that the "pattern of racketeering" is alleged to have a much more narrow goal, *(see* Doc. 1 ¶ 177, alleging that the pattern of activity was all "in furtherance of" the EELV scheme), but the " 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Turkette,* 452 U.S. at

583, 101 S.Ct. 2524. A single pattern of racketeering activity thus does not define the scope of the enterprise.

**6.** Under RICO, " 'person' includes any individual or entity capable of holding a legal or beneficial interest in property...." 18 U.S.C. § 1961(3).

rate entities, which comports with legislative intent and policy." *Id.* at 1270. This distinctness rule "reflects Congress' intention in § 1962(c) to target a specific variety of criminal activity, 'the exploitation and appropriation of legitimate businesses by corrupt individuals.'" *Id.* (quoting *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union, 639*, 883 F.2d 132, 139 (D.C.Cir.1989), *rev'd in part on other grounds*, 913 F.2d 948 (D.C.Cir.1990) (en banc)).

When the Eleventh Circuit Court of Appeals recently adopted the distinctness rule in *Goldin I*, it joined all of the other circuits and overruled the contrary prior decision of a three-judge panel in *United States v. Hartley*, 678 F.2d 961 (11th Cir. 1998). Courts have applied this rule in several ways to preclude suits against corporations. For example, the rule has prevented a plaintiff from naming a corporation as both the person and the enterprise, *Haroco v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384, 402 (7th Cir.1984); from naming a corporation as the person and naming a division of that corporation as the enterprise, *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir.1982), *overruled on other grounds by Busby v. Crown Supply, Inc.*, 896 F.2d 833, 840 (4th Cir.1990); from naming a corporation as the person and naming a grouping of that corporation's subsidiaries as the enterprise, *Discon v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir.1996) (*contra Haroco*, 747 F.2d at 402); and from naming a corporation as the person and naming a grouping of that

corporation's own employees and agents as the enterprise, *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339, 344 (2d Cir.1994).

It is on the *Riverwoods* application of the rule that Boeing hangs its hat. Boeing characterizes the alleged enterprise as a grouping of divisions of Boeing (the EELV and EKV proposal teams), Boeing employees (Erskine and Satchell) and a Boeing "agent" (Branch).[7] Boeing argues it cannot be named as a RICO "person" because the alleged enterprise is "nothing more than a subdivision or a part of" Boeing and thus Boeing is no more distinct from the BTSTE than the corporation in *Riverwoods* was from the grouping of the corporations' employees and agents alleged in that case to be the enterprise. (Doc. 46 at 6.)

Lockheed counters that because Branch was not technically a Boeing employee or agent at all relevant times, Boeing is sufficiently distinct from the enterprise that includes Branch. According to Lockheed, Boeing was simply one of many distinct members of the association-in-fact enterprise, the BTSTE. Lockheed analogizes this case to one in which a district court held that "where the alleged enterprise consists of a corporation and its present and former employees who allegedly continued their racketeering activity after leaving their employment in the corporation, the pleadings sufficiently allege an enterprise separate and distinct from the RICO persons." *Ctr. Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.*, 808

---

**7.** Even this is a generous reading of Lockheed's definition of the enterprise. Lockheed's proposed enterprise specifically includes only the two proposal teams, and does not specifically include Branch. (Doc. 1 ¶ 175.) Read strictly, the Complaint alleges that subdivisions of Boeing made up the enterprise and thus does not allege that Branch formed a *part* or was a *member* of the enter-

prise. Pursuant to this reading, the Complaint only alleges that Branch, along with the other Defendants, "conducted" the affairs of the enterprise through a pattern of racketeering activity. (*Id.*) Branch eventually became a part of the EELV proposal team, however, so it is not unfair to presume that Lockheed included Branch as a member of the alleged enterprise.

F.Supp. 213, 236 (S.D.N.Y.1992), *aff'd,* 99 F.3d 401 (2d Cir.1995).

Because Branch was neither formally an employee or agent of Boeing, nor completely disassociated from Boeing like an ex-employee, neither the facts of *Riverwoods* nor those of *Center Cadillac* are convincingly analogous to the facts presented here.[8] The Eleventh Circuit's decision in *United States v. Goldin,* 219 F.3d 1271, 1277 (11th Cir.2000) ("*Goldin II* "), along with *Riverwoods,* two other important Second Circuit distinctness cases, and the only Supreme Court distinctness case, *Cedric Kushner Promotions, Ltd. v. Don King,* 533 U.S. 158, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001), demonstrates that distinctness is a fact-intensive inquiry that is not driven solely by formal legal relationships among the alleged "associates in fact." Even where formalities were important to the distinctness inquiries in these cases, the courts were guided by common-sense readings of the complaints in the context of the RICO statute and by the purposes of the statute. These cases show that the allegations of Branch's "association with" the BTSTE does not make Boeing sufficiently distinct from the BTSTE to render Boeing a "person" under RICO.

The first and only case in which the Eleventh Circuit Court of Appeals applied the distinctness rule must guide the analysis of Lockheed's allegations. In *Goldin II,* the court found that each of three corporations—Goldin Mississippi, Goldin Alabama, and Goldin Louisiana—was sufficiently distinct from an alleged association-in-fact enterprise consisting of the three corporations, such that each corporation could be a RICO defendant "person." 219 F.3d at 1277. The Court of Appeals reasoned that, despite mutual connection to the original Goldin and some overlapping

ownership, each corporate "person" was truly "separate and distinct. Each is incorporated in a separate state. Each is a separate ongoing business with a separate customer base. Each is free to act independently and advance its own interests contrary to those of the other two corporations." *Id.*

The Eleventh Circuit Court of Appeals considered the facts in *Goldin II* to lie somewhere in between those in two Second Circuit cases, *Securitron Magnalock Corp. v. Schnabolk* and *Discon, Inc. v. NYNEX Corp. Goldin II,* 219 F.3d at 1277. In *Securitron,* the Second Circuit Court of Appeals held that even though two corporations had the same owner and president, each corporation was sufficiently distinct from an enterprise consisting of the two corporations and their owner because the corporations were "independent entit[ies]." 65 F.3d 256, 263 (2d Cir.1995). In *Discon,* in contrast, the same court upheld the dismissal of a complaint that named a parent holding company, NYNEX, and two of its wholly-owned subsidiaries as "persons" who had illegally conducted the affairs of an association-in-fact enterprise made up of those same three companies. 93 F.3d 1055, 1063 (2d Cir.1996), *vacated on other grounds* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). The court in *Discon* reasoned that, despite the fact that the subsidiaries were legally distinct from the holding company, they were in fact indistinct from the holding company with whom they allegedly formed the association-in-fact enterprise. *Id.* at 1064. This was because the subsidiaries acted "on behalf of the" NYNEX. *Id.* This holding made clear that formally separate entities are not always truly distinct for RICO purposes. *Id.* at 1063–64 (distinguishing *Cul-*

---

8. It is noted that *Center Cadillac* was decided before the Second Circuit ruled in *Riverwoods* that a corporation is not sufficiently distinct from an enterprise comprised of its own employees.

*len v. Margiotta,* 811 F.2d 698 (2d Cir. 1987), in which the Second Circuit found that a municipality, the town's Republican Committee, and the county's Republican Committee were *both* legally distinct *and* capable of being be differentiated from the enterprise-group).

*Discon* only confirmed what had been hinted at by the Second Circuit Court of Appeals in *Riverwoods.*[9] In the latter case, real estate developers who had borrowed from Marine Midland Bank's predecessor alleged that when the Bank acquired the predecessor, the Bank and several of its vice presidents illegally forced the borrowers to restructure their loans. The plaintiffs sought RICO civil damages from the Bank itself, alleging that the Bank was a "person" who illegally conducted the affairs of the "Restructuring Group Enterprise," an association-in-fact consisting of the Bank itself and the employees who had negotiated the restructuring. The Second Circuit Court of Appeals held that the Bank was not distinct enough from the proposed enterprise to justify a claim against the Bank as a RICO "person."

In *Riverwoods,* the court wrote that the distinctness principle "may not be circumvented" by artful pleading such as alleging that the employees of the corporation, rather than just the corporation, make up the enterprise. *Id.; see also Discon,* 93 F.3d at 1063 (quoting this language). Thus, though the distinctness rule "does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise," the rule *does* foreclose the prospect of a corpo-

ration being held liable where it associates with others who are not "sufficiently distinct from itself." *Riverwoods,* 30 F.3d at 344. The court did consider traditional notions of the formal legal relationship of employee/agent to employer important to the distinctness inquiry presented by the facts of that case. *Riverwoods,* 30 F.3d at 344 ("Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant [person] itself."). The opinion as a whole, however, makes the point that the ultimate test of sufficient distinctness does not always turn on "legal fictions." Whether a corporation may be named as a RICO "person" cannot be said to be dependent solely on formalities or reducible to a single set of rules because, as the Second Circuit noted, the distinctness rule is rooted in the language of 1962(c), "comports with legislative intent and policy," and "recognizes that the enterprise is often a passive instrument or victim of racketeering activity." *Riverwoods,* 30 F.3d at 343.

The only Supreme Court case to address the distinctness rule, *Cedric Kushner Promotions, Ltd. v. Don King,* 533 U.S. 158, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001), echoes *Riverwoods* by instructing that the designations of "persons" and "enterprises" should fit naturally into the language of the statute and should effectuate the purposes of the statute. In *Cedric Kushner,* the Supreme Court held that the RICO distinctness principle was not offended by charging Don King, the individ-

---

**9.** Lockheed's assertion that *Riverwoods* is no longer good law lacks merit. It is true that another Second Circuit Court of Appeals decision that was later overruled by the Supreme Court had relied on *Riverwoods. Cedric Kushner Promotions, Ltd. v. King,* 219 F.3d 115, 117 (2d Cir.2000), *rev'd,* 533 U.S. 158,

121 S.Ct. 2087, 150 L.Ed.2d 198 (2001). The Supreme Court made clear, however, that the Second Circuit *Cedric Kushner* decision had *incorrectly* analogized to *Riverwoods;* the Supreme Court did not suggest that *Riverwoods* was not good law. *Cedric Kushner,* 533 U.S. at 166, 121 S.Ct. 2087.

ual, as a "person" who associated with or was employed by the "enterprise," Don King Productions, an incorporated entity of which King was the president and sole shareholder. 533 U.S. at 163, 121 S.Ct. 2087. The Court wrote that it found nothing in the statute to require more "separateness" than that entailed by the different legal status an individual has from his incorporated self. *Id.* Contrary to Lockheed's suggestion at oral argument, however, *Cedric Kushner* does not stand for the proposition that formal legal relationships or a lack thereof among those allegedly "associated in fact" will always be determinative of distinctness in every case. (*See* Tr. of Hr'g on Mot. to Dismiss at 87–90.) The opinion as a whole, like those of *Riverwoods* and *Discon,* makes clear that distinctness is not always commensurate with "legal fictions."

As the Second Circuit Court of Appeals had in *Riverwoods,* the Supreme Court noted in *Cedric Kushner* that the distinctness requirement arises from the language of section 1962(c), which "says that it applies to 'person[s]' who are 'employed by or associated with' the 'enterprise.' In ordinary English one speaks of employing, being employed by or associating with others, not oneself." *Cedric Kushner,* 533 U.S. at 161, 121 S.Ct. 2087 (citations omitted). It was natural, the Court wrote, to speak of Don King, "a corporate employee, as 'a person employed by or associated with' the corporation," Don King Productions. *Id.* at 164, 121 S.Ct. 2087. The Court distinguished the facts in *Riverwoods* because in that case it was "less natural to speak of [the Bank] as 'employed by' or 'associated with' an 'enterprise'" made up of a bank together with its own employees and agents. *Id.* at 166, 121 S.Ct. 2087 (also distinguishing facts of *Discon* on same basis).

As it regularly does when construing the terms of the RICO statute, the Supreme Court also considered whether applying the statute and the distinctness principle to find Don King a proper RICO "person" was "consistent with the statute's basic purposes as [the] Court has defined them." *Cedric Kushner,* 533 U.S. at 164, 121 S.Ct. 2087; *see Sedima v. Imrex Co.,* 473 U.S. 479, 498, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (noting that RICO is to be "liberally construed to effectuate its remedial purposes") (quoting Pub.L. 91–452, § 904(a), 84 Stat. 947). The history of the statute reveals that it was meant to protect the public not only from wholly illegitimate or illegal enterprises, but also from those who would use unlawful acts to victimize a legitimate enterprise and from "those who would unlawfully use a [legitimate] enterprise as a 'vehicle' through which 'unlawful ... activity is committed'...." *Cedric Kushner,* 533 U.S. at 164–65, 121 S.Ct. 2087; *see also Reves v. Ernst & Young,* 507 U.S. 170, 180–82, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (describing differences in other bills proposed and that which became RICO).

As the Seventh Circuit Court of Appeals put it, an individual who incorporates "gets some legal protections from the corporate form, such as limited liability; and it is just this sort of legal shield for illegal activity that RICO tries to pierce." *R.D. McCullough, II v. Suter,* 757 F.2d 142, 144 (7th Cir.1985). Fictitious legal "distinctness," such as between an individual and his corporate self, is important to RICO distinctness to the extent it bears on effectuating this historical policy, *not,* as Lockheed suggests, because formalities are always a sufficient basis on which to rest a finding of distinctness. Indeed, the Supreme Court distinguished the facts in *Cedric Kushner* from those in *Discon,* in which, as discussed, the Second Circuit found that *despite* the formal distinctness between a holding company and its subsidiaries, an association-in-fact enterprise

made up of those companies was not sufficiently distinct from each company named as a RICO defendant "person."

Analysis of the facts and reasoning in *Goldin II, Securitron, Discon, Riverwoods*, and *Cedric Kushner* confirms the common-sense conclusion that Boeing is not a proper defendant "person" in this case because Boeing is not sufficiently distinct from the BTSTE despite Branch's involvement in the BTSTE. Lockheed alleges that Branch was at all relevant times seeking a job with Boeing; that Boeing promised Branch a job, *quid pro quo,* if he provided Boeing with the Lockheed information that would help Boeing win the first phase of the EELV bid; and that Branch was always working "on behalf of" Boeing. (*See, e.g.,* Doc. 1 ¶¶ 63–70, 75, 101.) The distinctness rule may not be circumvented by Lockheed's artful grouping into an association-in-fact of the corporation itself (Boeing), employees of the corporation (Erskine and Satchell), groups of employees of the corporation (the EKV and EELV proposal teams), and a would-be employee of the corporation (Branch), all of whom were at all relevant times allegedly working on behalf of the corporation. Not only was Branch himself not "sufficiently distinct" from Boeing during the five months before he became an actual employee, those five months did not morph the allegedly years-long BTSTE, which would otherwise clearly be a corporate enterprise indistinct from Boeing, into something separate from Boeing.[10]

Unlike the corporations named as "persons" and alleged to comprise the association-in-fact in *Goldin II* and *Securitron*, none of those alleged to make up the BTSTE ever acted independently from Boeing or the BTSTE to advance his own interests. Erskine and Satchell were employees of Boeing, and Branch was analogous to them and to the employees or agents in *Riverwoods* because even before he became an agent or employee of Boeing, he was always "acting on behalf of" Boeing.[11] Like the subsidiaries in *Discon* vis-à-vis their parent holding company, Branch, as a "non-employee," was only technically distinct from Boeing.

As was the case in *Discon* and *Riverwoods* there is an unnatural fit between the allegations against Boeing as a person and section 1962(c). Lockheed's allegations about Boeing being "employed by" or "associated with" the alleged enterprise are like those in *Riverwoods*, which the Supreme Court called "odd" in *Cedric Kushner*, because Lockheed's allegations speak of Boeing as "a person employed by or associated with" a group made up of Boeing employees and Branch, who was

---

10. With regard to whether there was a continuing and ongoing *enterprise,* Lockheed's arguments emphasize the several different goals of the alleged enterprise and the enterprise's long history and varied personnel. In that context, Lockheed de-emphasizes the allegations suggesting that one person and one bid, Branch and the EELV bid, were so integral to many of the alleged predicate acts. As already discussed, the allegations about the enterprise do indeed suggest that it was ongoing and continuing beyond the five months before Branch was hired and was much larger than Branch himself. With regard to the issue of whether Boeing may be a liable person associated with this enterprise, however, Lockheed seeks to define the enterprise by Branch's association with it, particularly by five months of that two-year long association. Lockheed cannot have it both ways.

11. "Three elements are needed to establish an apparent agency: (1) a representation by the purported principal; (2) reliance on that representation by a third party; and (3) a change in position by the third party in reliance upon such representation." *Ilgen v. Henderson Props., Inc.,* 683 So.2d 513, 514 (Fla. 2d DCA 1996). Actual agency requires a showing of: "(1) acknowledgment by the principal that the agent will act for him; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Id.* at 515.

working on behalf of Boeing. There can be little doubt that the odd grouping Lockheed alleges is designed as it is for no other reason than to reach the deep pockets of Boeing. It would have been far more obvious, workable, and natural to allege that Boeing was the "enterprise" which Erskine, Satchell, and Branch conducted through a pattern of racketeering activity.[12] There is no suggestion in this case, moreover, that endorsing an unnatural fit between the allegations and the statute or focusing on the lack of a formal employment relationship between Branch and Boeing is necessary to effectuate the special remedial purposes of RICO. Branch's association with the BTSTE does not make Boeing sufficiently distinct from that enterprise such that Boeing is a "person" under section 1962(c).

Lockheed also argues that the allegation that the enterprise included "others unknown" to Lockheed makes the BTSTE sufficiently distinct from Boeing. It does not. The "others unknown," first of all,

---

12. There is no debate about whether Lockheed has sufficiently alleged that Branch (and the other individual defendants) "associated with" and was later "employed by" Boeing/the BTSTE. The statute does not suggest, however, that every person who "associates with" an association-in-fact enterprise and participates in conducting that enterprise's affairs illegally need be considered a defining member of that enterprise. Indeed, the Court of Appeals for the Eleventh Circuit has often held that associations-in-fact are often fluid, "amoeba-like," and comprised of shifting personnel. *See, e.g., United States v. Hewes,* 729 F.2d 1302, 1311 (11th Cir.1984) (rejecting the contention that an association-in-fact "requires participation of all of its members throughout the life of the enterprise" and finding that "shifting associations" whose participants "overlapped to a significant degree" formed an enterprise under the statute); *United States v. Church,* 955 F.2d 688, 698–99 (11th Cir.1992) (same).

Many of these difficult distinctness cases could potentially be eliminated by a more particular reading of the association-in-fact definition. It could be argued that a RICO defendant corporation should never be considered a "member" of an association-in-fact. The definition of enterprise "includes any *individual,* partnership, corporation, association, or other legal entity, and any union or group of *individuals* associated in fact although not a legal entity...." 18 U.S.C. § 1961(4) (2001) (emphasis added). As the Eleventh Circuit Court of Appeals once stated, because section 1961(3) defines a "person" as an individual or entity capable of holding a beneficial interest in property, "[i]t is clear ... that 'individual' is used differently from 'person' in the act to connote *a living person."*

*United States v. Hartley,* 678 F.2d 961, 989 n. 46 (11th Cir.1982), *overruled on other grounds by Goldin I,* 219 F.3d 1268 (11th Cir.2000) (en banc) (emphasis added). Because corporations are not living individuals, they thus arguably cannot be a part of an association-in-fact under section 1962(c), though of course they can, as "persons," associate *with* an association-in-fact enterprise. *Id.* This theory that Congress did not have corporations in mind when it wrote the second half of section 1961(4) is buttressed by the fact that corporations necessarily fall within the first half of the definition. So does the often-repeated theory that the second part of the definition of enterprise was designed to snare not "duly formed corporation[s] that elect[ ] officers and hold[ ] annual meetings," but "amoeba-like infra-structure[s] that control[ ] secret criminal networks." *Hewes,* 729 F.2d at 1310 (quoting *United States v. Elliott,* 571 F.2d 880, 898 (5th Cir.1978)); *contra C.A. Westel de Venez. v. Am. Tel. & Tel. Co.,* No. 90 Civ. 6665, 1994 WL 558026, at *4–6, 1994 U.S. Dist. LEXIS 14481, at *13–15 (S.D.N.Y. Oct. 11, 1994) (holding that only an "overly rigid" reading of section 1961(4) would convince that groups of corporations cannot be "associations in fact" because the definition of enterprise is by its terms not exhaustive, and stating that such a reading would "perversely insulate the most sophisticated racketeering combinations from RICO's sanctions, the precise opposite of Congress' intentions.") This issue is academic, however, because it has been either not litigated or overlooked by courts. Moreover, courts in this circuit and others have approved associations-in-fact enterprises made up of groupings of corporations. *See, e.g., Goldin II,* 219 F.3d 1271 (11th Cir.2000).

are alleged to have been working on behalf of Boeing and thus furnish no more distinctness than Branch does. Secondly, while it is reasonable to infer from the Complaint that Boeing included Branch in the "EELV Proposal Team" that was said to be a part of the enterprise, the Complaint does not reasonably imply that these unknowns are alleged to be part of the enterprise. Thirdly, it would not be fair to hold that simply alleging "unknowns" is sufficient to circumvent the distinctness rule. Lockheed's final argument for distinctness, raised for the first time at oral argument, is that the Complaint alleges that McDonnell Douglas was another entity in the "enterprise" because some of the predicate acts took place before Boeing acquired McDonnell Douglas. (Tr. of Hr'g on Mot. to Dismiss at 8.) Only an extremely strained reading of the Complaint supports this argument, and Defendants cannot be said to have been on notice that Lockheed was claiming that McDonnell Douglas played a part in this enterprise.

The section 1962(c) RICO claim against Boeing and the parallel state claim against Boeing under section 772.103(3) of the Florida Statutes are accordingly dismissed.

*2. Conspiracy: 18 U.S.C. § 1962(d) & Section 772.103(4), Fla. Stat.*

■ The conclusion that Boeing is indistinct from the BTSTE also dictates that Lockheed's conspiracy claims in Counts II and IV against Boeing, under section 1962(d) and section 772.103(4), Florida Statutes, be dismissed. Lockheed's claim in essence is that Boeing conspired to conduct or participate, directly or indirectly, in the conduct of an enterprise comprised of Boeing, employees of Boeing, and Branch through a pattern of racketeering activity. *See* 18 U.S.C. §§ 1962(c), (d). This allegation fits no more smoothly into section 1962(d) than the statement that Boeing conducted the affairs of that enterprise through a pattern of racketeering activity fits into section 1962(c). Furthermore, if distinctness were not required for a section 1962(d) claim, plaintiffs could circumvent the distinctness rule by simply bringing conspiracy claims, which are arguably easier to allege, rather than section 1962(c) claims.[13] *Accord Sluka v. Estate of Herink,* No. 94 CV 4999, 1996 WL 612462, at *7 (E.D.N.Y. Aug. 13, 1996).

Several other courts have concluded that distinctness is required for civil section 1962(d) conspiracy claims in the same way as for section 1962(c) claims. *See, e.g., New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.,* 18 F.3d 1161, 1165 (4th Cir.1994); *Genty v. Resolution Trust Corp.,* 937 F.2d 899, 907 (3d Cir.1991); *Sluka,* 1996 WL 612462, at *7. Others have held the same but on the more limited theory that a corporation only acts through its employees and agents. *See, e.g., Neb. Sec. Bank v. Dain*

---

**13.** To state a civil conspiracy claim under RICO, a plaintiff need only allege that the defendant conspired to violate some substantive provision of RICO, that some member of the conspiracy committed an overt act of racketeering, and that the act of racketeering injured the plaintiff. *Beck v. Prupis,* 162 F.3d 1090, 1098 (11th Cir.1998), *aff'd,* 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). The existence of an "agreement" to participate in a RICO conspiracy may be proved by "showing (1) the existence of an agreement on an overall objective, or (2) in the absence

of an agreement[ ] on an overall objective that the defendant agreed personally to commit two or more predicate acts." *United States v. Castro,* 89 F.3d 1443,1451 (11th Cir.1996). A fact-finder may infer there was an agreement "from circumstantial evidence of the scheme." *United States v. Church,* 955 F.2d 688, 695 (11th Cir.1992). In this way, "the conspiracy provision allows persons who are responsible for an injury, but did not actually participate in the injury-causing activity, to be held liable." *Beck,* 162 F.3d at 1099 & n. 18; *Beck,* 529 U.S. at 506–07, 120 S.Ct. 1608.

*Bosworth, Inc.*, 838 F.Supp. 1362, 1371 (D.Neb.1993). Still others have reached the same conclusion but solely on the theory that the *Copperweld* antitrust intracorporate conspiracy doctrine, which forbids finding that a conspiracy exists between a corporation and either its employees or its subsidiaries for purposes of Sherman Act conspiracy claims, applies equally to RICO conspiracy claims. *See, e.g., Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 899 (8th Cir.1999).[14]

Those courts that have allowed section 1962(d) claims to stand in cases where distinctness was an issue for companion section 1962(c) claims have done so for either one or both of two reasons. The first is that the court in question either did not address distinctness or found that plaintiffs *had* alleged an enterprise distinct from the corporate defendant "person." *See, e.g., Webster v. Omnitrition Int'l*, 79 F.3d 776, 787 (9th Cir.1996) (declining to dismiss section 1962(d) claim, but never addressing whether there was distinctness between the alleged enterprise and the named defendant "persons"); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280–81 (7th Cir.1989) (declining to apply distinctness principle to section 1962(d) claims against corporate defendant because defendant "person" was distinct from the enterprise it allegedly conspired to conduct through a pattern of racketeering activity).

The second reason cited by these courts for declining to dismiss section 1962(d) claims where there was an issue of distinctness is that the parties simply debated whether the *Copperweld* intracorporate conspiracy doctrine applied to RICO claims, and the courts in question correctly declined to apply that doctrine to RICO claims because the *Copperweld* doctrine applies only in the antitrust context. *See, e.g., Ashland Oil*, 875 F.2d at 1281 (refusing to apply *Copperweld* intracorporate conspiracy doctrine to case of alleged RICO conspiracy between a parent corporation and its wholly-owned subsidiary); *Webster*, 79 F.3d at 787 (adopting rationale of *Ashland Oil*); *Bowman v. W. Auto Supply Co.*, 773 F.Supp. 174, 180 (W.D.Mo. 1991) (adopting rationale of *Ashland Oil*); *Mauriber v. Shearson/Am. Express, Inc.*, 567 F.Supp. 1231, 1241 (S.D.N.Y.1983) (rejecting extension of *Copperweld* to RICO conspiracy and also noting that intracorporate conspiracies are allowed in other contexts).

Section 1962(d) cases in which the court did find distinctness between the defendant "person" and the enterprise do not apply. As stated above, in the instant case there is a lack of distinctness between Boeing and the BTSTE. Furthermore, the *Copperweld* doctrine has not been offered by Defendants as a grounds for dismissal.[15] Lockheed's section 1962(d) RICO claim against Boeing, and its parallel state claim against Boeing under section 772.103(4), Florida Statutes, are accordingly dismissed. The RICO and the Florida RICO Act claims in Counts I—IV against Erskine, Satchell and Branch are discussed below.

### C. *Erskine, Satchell, & Branch: Pattern of Racketeering Activity*

#### 1. *18 U.S.C. § 1962(c)*

Assuming that Lockheed has sufficiently alleged "(1) the existence of an enterprise; (2) that the enterprise affected interstate

---

**14.** *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), and the intracorporate conspiracy doctrine are discussed at length in the context of Lockheed's Sherman Act claims.

**15.** The Supreme Court did recently confirm that the *Copperweld* intracorporate conspiracy doctrine "turns on specific antitrust objectives." *Cedric Kushner*, 533 U.S. at 166, 121 S.Ct. 2087.

commerce; (3) that the defendants were employed by or associated with the enterprise; [and] (4) that the defendants participated, either directly or indirectly, in the conduct of the affairs of the enterprise," all of the individual Defendants challenge the allegations relating to the fifth element, "that the defendants participated through a pattern of racketeering activity." *United States v. Starrett*, 55 F.3d 1525, 1541 (11th Cir.1995).[16] This fifth element of a section 1962(c) claim requires allegations (a) that the defendant committed at least two of the predicate racketeering acts listed in section 1961(1); (b) that there was relatedness among the predicate acts; and (c) that the multiple predicates "amounted to, or threatened the likelihood of, continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Starrett*, 55 F.3d at 1542.[17]

Lockheed alleges that the individual Defendants committed several predicate acts in the categories of mail and wire fraud and receipt and use of stolen property that had traveled across state lines. (Doc. 1 ¶ 184); *see* 18 U.S.C. § 1961(1) (listing predicate acts). None of the individual Defendants argues that Lockheed attributes to him an insufficient number of predicate acts. The individual Defendants also do not argue that Lockheed has pled the predicate acts with insufficient particulari-

ty, or that the alleged acts were not related. Instead, they all argue that the allegations would not support a finding that the alleged predicate acts demonstrate continued criminal activity or a threat of continued criminal activity. (Doc. 46 at 6; Doc. 41 at 3–5; Doc. 55 at 4; Doc. 56 at 1.) [18]

■ The specific facts of each case determine whether a threat of continued criminal activity has been sufficiently alleged or shown. *H.J. Inc.*, 492 U.S. at 242–43, 109 S.Ct. 2893. The concept of continuity may refer to either "a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 242, 109 S.Ct. 2893. The former period is referred to as "closed-ended continuity," and the latter as "open-ended continuity." *See id.; Aldridge v. Lily–Tulip, Inc. Salary Retirement Plan Benefits Comm.*, 953 F.2d 587, 593 (11th Cir.1992). Lockheed first argues that it has alleged sufficient facts to state a claim of closed-ended continuity. A party may demonstrate closed-ended continuity "by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893.

---

**16.** Though Boeing addressed this element, because the RICO claims against Boeing are dismissed for lack of distinctness the rest of this discussion of RICO deals only with the allegations against the individual Defendants Erskine, Satchell, and Branch.

**17.** The Eleventh Circuit has also stated that proof of the fifth element requires not only evidence of pattern but also evidence "that the defendants' predicate acts were related to the enterprise charged." *Starrett*, 55 F.3d at 1542. Erskine, Satchell, and Branch have not argued that Lockheed's allegations fail to satisfy this "relationship" requirement.

**18.** Erskine does state that "there is no allegation that Erskine participated in any purported conversion of trade secrets from any person or any other than the alleged incident involving Lockheed [sic]." (Doc. 55 at 4.) It is not clear what he means by this. Assuming he means that he is not alleged to have stolen anything himself, this does not bar the claim against him and is not a reason to dismiss. Lockheed alleges that the individual Defendants' predicate acts were in the categories of mail fraud, wire fraud, and interstate transportation and use of stolen property. (*See* Doc. 1 ¶ 184.)

Lockheed alleges that each of the individual Defendants committed at least two predicate acts over a period of at least two years. Branch's first alleged predicate act took place in 1996 when he transported stolen Lockheed property interstate from either Florida or Colorado to California to meet with Erskine and Alexiou. (Doc. 1 ¶ 183(i).) Between 1997 and mid–1998, Branch allegedly flew approximately forty-three times from Florida to California to transport stolen documents and spoke with Satchell over the phone about those documents. (*Id.* ¶¶ 182(ii)-(iii), 183(xi).) Erskine's first alleged predicate act took place in 1996 when he transported from Colorado to California stolen Lockheed papers that Branch had given him at their first meeting. (*Id.* ¶ 183(i).) Throughout the course of the EELV competition and until Boeing submitted its bid in July of 1998, Erskine allegedly took receipt of stolen documents that had been transported across state lines and used them in preparing Boeing's bid. (*Id.* ¶¶ 183(xii), (xiii).) Satchell's first alleged predicate act took place "shortly after Branch began working for Boeing," which was in early 1997 (*id.* ¶ 71), when Satchell and Branch began having telephone conversations about the Lockheed papers (*id.* ¶ 182(ii)). Lockheed alleges that the phone conversations continued into mid–1998 and that Satchell also received Lockheed papers in the mail in 1997 and 1998. (*Id.* at ¶ 182(iii).) These allegations of interstate fraud and trafficking in stolen property over at least two years represent much more than claims of "predicate acts extending over a few weeks or months." *See H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. 2893. The Complaint thus sufficiently alleges closed-ended continuity for purposes of the pattern element. *See Starrett*, 55 F.3d at 1549 (finding that evidence of a series of related predicates extending over a period of two years was sufficient to establish the fifth RICO element against one defendant) (citing *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893).[19]

Lockheed also argues that it has alleged facts sufficient to show open-ended continuity. The Supreme Court has suggested examples of how open-ended conti-

---

**19.** The allegations about the acts of "Boeing," and about the acts of Alexiou, Black, and others employed by Boeing are irrelevant here. The RICO claims against Boeing have been dismissed and the other individuals are not named as defendants. The listing of these individuals' acts among the allegations of racketeering perhaps stems from confusion about the nature of the pattern element. Like each Defendant's failure to focus on the predicate acts alleged to have been committed by himself in favor of more general arguments, the allegations referring to non-parties seem to stem from the understanding that, under RICO, the plaintiff must establish "that the acts of racketeering *by the alleged enterprise* be related and amount to, or pose a threat of, continued criminal activity." (*See, e.g.*, Doc. 41 at 5) (emphasis added.) A person is not liable under section 1962(c) for an *enterprise's* pattern of racketeering activity; he is liable for conducting the affairs of an enterprise through his *own* pattern of racketeering activ-

ity. 18 U.S.C. § 1962(c); *H.J. Inc.*, 492 U.S. at 232, 244, 109 S.Ct. 2893. To state a claim against a particular person, a plaintiff thus needs to establish much more than that the enterprise's activities pose a threat of continued criminal activity; the plaintiff needs to establish that the acts of the *person* pose a threat of continued criminal activity.

This confusion between what a plaintiff must show about what the "person" did and what a plaintiff must show about the alleged "enterprise" may exist in part because, as discussed in section A of this discussion, "continuity" is relevant to proof of an association-in-fact "enterprise" and, as explained in this section, to proof of a "person's" pattern of racketeering activity. Further confusing the issues is the fact that, as discussed below, the nature of the "enterprise" may serve as part of the proof that the defendant "person's" acts constitute an open-ended pattern of racketeering activity.

nuity might be shown, including the following:

> [T]he threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.

*H.J. Inc.*, 492 U.S. at 242–43, 109 S.Ct. 2893. Such a showing may be made with reference to "a traditional criminal enterprise or with respect to an ongoing legitimate business." *Jones v. Childers*, 18 F.3d 899, 911 (11th Cir.1994). Furthermore, there is no requirement that the predicate acts each be a part of separate illegal "schemes." *H.J. Inc.*, 492 U.S. at 237, 241–42 & n. 3, 109 S.Ct. 2893. A showing of this sort "ordinarily must encompass a sustained period or set of examples sufficient to draw this conclusion with reasonable certainty." *Jones*, 18 F.3d at 912. As the Supreme Court's language suggests, however, a plaintiff attempting to show continuity by reference to the enterprise itself may make use of "the totality of the evidence." *Id.* The plaintiff may thus present evidence of the defendant's business practices with respect to not just the plaintiff, but others as well. In *Jones*, for example, the Eleventh Circuit Court of Appeals found that the defendant's two predicate acts perpetrated against the plaintiffs did not, "in and of themselves, provide a sufficient basis for finding 'continuity....' " *Jones*, 18 F.3d at 912. Nevertheless, the court found that "the totality of the evidence as to [the defendant's] business practices with respect to [other individuals] sufficiently establishe[d] a pattern of criminal activity." *Id.* at 913; *see also United States v. Church*, 955 F.2d 688, 694 (11th Cir.1992).

Lockheed's Complaint alleges multiple related predicate acts and that the BTSTE existed for purposes of stealing trade secrets from Boeing's competitors "including, without limitation, Lockheed Martin." (Doc. 1 ¶¶ 175, 180.) Most of the alleged predicate acts were associated with winning the EELV bid, but the Complaint also contains allegations about stealing proprietary information from Raytheon regarding the EKV bid and about stealing from AssureSat. (*Id.* ¶¶ 156–61.) Under *H.J. Inc.* and *Jones*, these allegations sufficiently state an open-ended pattern. Satchell, Erskine, and Branch's motions to dismiss the section 1962(c) RICO claims against them are accordingly denied.

Because Satchell agreed with Boeing that the federal law conclusions should determine the fate of the Florida RICO claims, his motion to dismiss the parallel claim against him pursuant to section 772.103(3), Florida Statutes, is also denied. This conclusion would apply to Erskine and Branch as well had they not raised an argument Satchell did not. As already noted, Erskine and Branch agreed that federal law should govern the Florida RICO claims, except in the context of the "pattern of racketeering activity" element.[20] Their extra argument that the Florida RICO Act's more stringent pattern requirement requires dismissal of the Florida claims against them is discussed below.

### 2. Section 772.103(3), Fla. Stat.

■ Erskine and Branch argue that Lockheed has failed to state a claim against them for violation of section 772.103(2) of the Florida Statutes, pointing out that the Florida RICO Act "pattern requirement" is more stringent than the RICO requirement. (Doc. 55 at 5; Doc. 56 at 1.) The Florida RICO Act provides that

---

20. *See supra* note 4.

it is unlawful for any person "[e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity or the collection of an unlawful debt." § 772.103(2), Fla. Stat. (2003). Criminal activity includes several predicate crimes named in section 772.104(1), Florida Statutes, and a "pattern of criminal activity" under the Florida RICO Act consists of

> engaging in at least two *incidents* of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents; provided that the last of such incidents occurred within 5 years after a prior incident of criminal activity. For the purposes of this chapter, the term "pattern of criminal activity" shall not include two or more incidents of fraudulent conduct arising out of a single contract or transaction against one or more related persons.

§ 772.102(4), Fla. Stat. (emphasis added). The definition "refers to engaging in at least two 'incidents' of racketeering conduct rather than 'acts' of racketeering conduct set forth in [RICO.]" *State v. Marks*, 758 So.2d 1131, 1138 (Fla. 4th DCA 2000) (quoting *State v. Lucas*, 600 So.2d 1093, 1095–96 (Fla.1992)). "Thus, crimes committed at the *same time* cannot qualify as separate incidents for purposes of proving racketeering conduct under the Florida act." *Id.* (emphasis added).

Erskine and Branch characterize Lockheed's Complaint as "merely" alleging "one incident." At worst, however, the alleged predicate acts arose in the context of one scheme-the scheme to steal and use Lockheed's EELV secrets. The fact that only a single *scheme* is alleged does not render a Florida RICO Act claim insufficiently pled if there are several *incidents* alleged. *Davis v. S. Bell Tel. & Tel. Co.,*

No. 89–2839–CIV, 1994 WL 912242, at *20 (S.D.Fla. Feb. 1, 1994) (holding that multiple solicitations in furtherance of one scheme to defraud customers satisfied the Florida Act requirements) (citing *H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. 2893). The Complaint alleges several incidents that took place at *several different times* spanning at least two years, satisfying the Florida Act pleading requirements. Erskine and Branch's motions to dismiss the section 772.103(3) claims against them are denied.

### D. *Erskine, Satchell, & Branch: Conspiracy*

#### 1. *18 U.S.C. § 1962(d)*

■ Erskine, Satchell, and Branch argue that the conspiracy claims against them should be dismissed because "where the Plaintiff fails to allege a substantive violation of RICO, no claim for civil conspiracy to violate RICO may exist." (Doc. 41 at 6; *see also* Doc. 55 at 5; Doc. 56 at 1.) This argument is without merit. First of all, as concluded in the previous section of this discussion, Lockheed *has* stated a claim against these three Defendants under section 1962(c). Secondly, the Defendants do not cite any case that supports their proposition that section 1962(d) claims necessarily fall with section 1962(c) claims. They all cite *Beck v. Prupis,* but in that case, in which the Supreme Court affirmed the Eleventh Circuit Court of Appeals, the Supreme Court explicitly declined to either adopt or even address that proposition:

> [W]e do not resolve whether a plaintiff suing ... for a RICO conspiracy must allege an actionable violation under §§ 1962(a)-(c), or whether it is sufficient for the plaintiff to allege an agreement to complete a substantive violation and the commission of at least one act of racketeering that caused him injury.

*Beck,* 529 U.S. 494, 506 n. 10, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). The issue in *Beck* was actually "whether a plaintiff can bring a section 1962(d) claim for injury flowing from an overt act that is not an act of racketeering." *Id.* The individual Defendants do not raise this or any other issue regarding the RICO conspiracy counts, and they do not cite any authority other than *Beck* for their proposition.

The Eleventh Circuit Court of Appeals' *Beck* opinion also does not support the individual Defendants' argument. In that opinion, the court did not address the idea that all section 1962(d) claims fall with section 1962(a)-(c) claims, nor did it suggest that such is the case.[21] On the contrary, the court upheld summary judgments for the defendant on section 1962(c) and (d) claims *for different reasons.* The court wrote that the plaintiff had standing to sue under section 1962(c) but had failed to prove the underlying predicate racketeering acts and so had failed to prove a violation of section 1962(c). *Beck v. Prupis,* 162 F.3d 1090, 1096–98 (11th Cir.1998). The court did not then automatically find that the section 1962(d) claim also failed. Instead, the court found that the plaintiff did not have standing to sue under section 1962(d) because he alleged that his injury had been proximately caused by an overt act committed in furtherance of the conspiracy instead of by actual racketeering activity. *Id.* at 1098.

The motions of Erskine, Satchell, and Branch to dismiss the RICO conspiracy claims against them are denied. Satchell's motion to dismiss the Florida RICO Act conspiracy claim against him is also denied. This conclusion would also apply to Erskine and Branch had they not raised

an argument regarding conspiracy claims under the Florida RICO Act that Satchell did not. Their extra argument is discussed below.

*2. Section 772.103(4), Fla. Stat.*

Erskine and Branch add the argument that the conspiracy claim brought under section 772.103(4) of the Florida Statutes is dependent on the section 772.103(3) Florida RICO Act claim so that the former should be dismissed because the latter should be. (Doc. 55 at 6; Doc. 56 at 1.) As was the case with the same argument regarding the federal conspiracy claims, because the section 772.103(3) claims against them are not dismissed, this argument is unavailing. The motions of Erskine and Branch to dismiss the Florida RICO Act conspiracy claims against them are accordingly denied.

*E. Summary*

Lockheed's Complaint sufficiently alleges that the BTSTE is an enterprise. The allegations do not support naming Boeing as a liable defendant "person," however, because Boeing is not sufficiently distinct from the BTSTE. The claims against Boeing in Counts I—IV are accordingly dismissed. Because Lockheed has sufficiently alleged the five elements of a section 1962(c) claim against Erskine, Satchell, and Branch, including that they engaged in a pattern of racketeering activity, their motions to dismiss the claims in Counts I and III against them are denied. Because Erskine, Satchell, and Branch have also provided no reason to dismiss the conspiracy claims against them and none is apparent, their motions to dismiss Counts II and IV against them are also denied.

---

**21.** Many other circuits *have* held that a plaintiff must allege a viable claim that the defendant violated one of sections 1962(a)-(c) in order to state a claim that a defendant violated section 1962(d). *See In re Managed Care,* 298 F.Supp.2d 1259, 1285–86 (S.D.Fla.2003) (citing cases). Because Lockheed has alleged viable claims against the individual Defendants under section 1962(c), there is no need to address this issue.

## V. THE ANTITRUST CLAIMS

Lockheed alleges that Boeing, Erskine, Satchell, and Branch intended to obtain monopoly power for Boeing by acquiring and using Lockheed's trade secrets in preparation for Boeing's EELV bid. Lockheed also alleges that the Defendants furthered the attempt by concealing their actions. Based on these allegations, Lockheed claims violations of the Sherman Act, 15 U.S.C. § 2 (2001), and of the Florida Antitrust Act of 1980, § 542.19, Florida Statutes (2003). Counts V and VII charge attempted monopolization under 15 U.S.C. § 2 and § 542.19, Florida Statutes. Counts VI and VIII charge conspiracy to monopolize under 15 U.S.C. § 2 and § 542.19, Florida Statutes. Defendants Boeing, Erskine, Satchell, and Branch have all moved to dismiss these antitrust claims, and they join in each others' arguments. (Docs. 46, 55, 41, & 56.)

### A. Counts V & VII: Attempted Monopolization

Section 2 of the Sherman Act provides, in part, that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony...." 15 U.S.C. § 2 (2001); *see also* 15 U.S.C. § 15(a) (providing for private right of action and civil damages). In order to state a claim for attempted monopolization under either the Sherman Act or the Florida Antitrust Act,[22] a plaintiff must allege facts that, if proven, would satisfy his burden at trial to prove that: (1) the defendant has engaged in predato-

ry or anticompetitive conduct (2) with a specific intent to monopolize and (3) that there is a dangerous probability that defendant will achieve monopoly power. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 993 (11th Cir. 1993). The third element of a proper attempted monopolization claim requires a two-part showing that a defendant is close to acquiring controlling market power over the relevant product market. *U.S. Anchor Mfg., Inc.,* 7 F.3d at 994. Focusing on this third element, Defendants challenge the legal sufficiency of Lockheed's allegations of both the relevant market and of Boeing's proximity to acquiring a controlling market share.

### 1. The Relevant Product Market

Determining the relevant product market for an attempted monopolization claim provides the frame of reference within which a defendant's relative market power is measured. The relevant product market is the "part of trade or commerce" that the defendant is allegedly attempting to monopolize. *See* 15 U.S.C. § 2; *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The "outer boundaries" of a product's market are defined by the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *U.S. Anchor Mfg. Inc.,* 7 F.3d at 995 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). All purchasers and suppliers within those boundaries make up the market for that product unless there is evidence that the market is narrower because of other considerations.[23]

---

**22.** "[T]he Florida legislature has, in effect, adopted as the law of Florida the body of antitrust law developed by the federal courts under the Sherman Act." *St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.,* 457 So.2d 1028, 1032 (Fla. 2d DCA 1984); § 542.32, Fla. Stat.; *All Care Nursing Serv.,*

*Inc. v. High Tech Staffing Servs., Inc.,* 135 F.3d 740, 745 n. 11 (11th Cir.1998) ("Federal and Florida antitrust laws are analyzed under the same rules and case law.").

**23.** Courts sometimes refer to "relevant product submarkets" to describe narrow relevant

*Id.* Where evidence shows, for example, "that consumers within the geographic area cannot realistically turn to outside sellers should prices rise within the defined area," the relevant market is limited by excluding suppliers outside of that geographic area. *T. Harris Young & Assocs., Inc. v. Marquette Elec., Inc.*, 931 F.2d 816, 823 (11th Cir.1991). The scope of the relevant market may also in some cases be narrowed to a certain "portion of customers." *Id.* at 824–25. Lockheed's attempt to define the relevant market with reference to only a subset of customers, the U.S. Government, is at issue here.

■ Ultimately, the contours of the relevant market and the defendant's relative power in that market are issues of fact. *U.S. Anchor Mfg., Inc.*, 7 F.3d at 994. Dismissals are exceedingly disfavored in antitrust cases because of their fact-intensive nature. *Covad Communications Co. v. BellSouth Corp.*, 299 F.3d 1272, 1279 (11th Cir.2002). Where, however, a plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, [the] relevant market is legally insufficient and a motion to dismiss may be granted." *JES Props., Inc. v. USA Equestrian, Inc.*, 253 F.Supp.2d 1273, 1282 (M.D.Fla.2003). A complaint is also legally insufficient where it shows that a plaintiff's proposed relevant market clearly excludes relevant geographic areas, purchasers, or suppliers. Such a complaint may therefore be dismissed because

proving the facts alleged could not support a finding of attempted monopolization.

As explained earlier, EELV is the Air Force's term for the service of designing, developing, building, and operating "the next generation of expendable launch vehicles." (Doc. 1 ¶ 11.) Lockheed proposes that EELVs are the relevant product, or rather the relevant service, and that no other services are in this market because EELVs are "a highly complex and unique product [and are] the only means reasonably available to launch medium, intermediate and heavy lift satellites into space economically and efficiently. There are no economic and technological substitutes." (Doc. 1 ¶¶ 221–22.) Lockheed thus alleges that there is no reasonable interchangeability of use between EELVs and other services because at no price would those needing to launch medium, intermediate, and heavy lift satellites stop purchasing EELVs in favor of another service. Defendants do not contest this delineation of the outer boundaries of the relevant market.

Lockheed's allegations propose alternative relevant markets for EELVs: (a) the "U.S. Government EELV market," for which the United States is the "relevant geographic market," or (b) the "worldwide commercial EELV market." (Doc. 1 ¶¶ 221–22.) Defendants argue that the Complaint shows that the first alternative, which excludes all purchasers other than the U.S. Government, is too narrow and therefore an insufficient proposed market. Defendants argue that the Complaint itself

product markets. "Submarket," however, is a misnomer; the submarket is simply the relevant market for a specially designed product for which the consumer has a relatively inelastic demand. *See* 2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* pt. 2, ch.5 ¶ 533 ("Speaking of submarkets is both superfluous and confusing in an antitrust case, where the courts correctly search for a 'rele-

vant market'-that is, a market relevant to the particular legal issue being litigated."); *U.S. Anchor Mfg., Inc.*, 7 F.3d at 995 (noting that the process for defining a submarket is the same as that for defining a market). In the hope of dispensing with this confusion, only the terms "relevant market" and "relevant product market" will be used in this discussion.

demonstrates that the second alternative is the relevant market.

*a. The U.S. Government EELV Market*

 Lockheed's first alternative allegation of the dangerous probability element of its attempted monopolization claim is based on the statement that Boeing "currently has a market share of approximately 75%" of its first proposed relevant market—the U.S. Government EELV market. (Doc. 1 ¶ 223.) Lockheed argues that the relevant market should exclude purchasers other than the U.S. Government because the government can only buy from domestic suppliers and would be the victim of reduced innovation and higher prices if one of its potential suppliers had a "monopoly" on the government's purchases. (Doc. 57 at 10–12.)

A relevant market sometimes consists of only a portion of those purchasers of a generally-defined product or service— boats, for example. It is not the nature of the purchasers that makes this narrowing appropriate, however. Rather, it is the nature of the more specific product or service in question-aircraft carriers, for example—that makes designating the narrower market legitimate:

> While a relevant product market can be limited to a portion of customers, such a limitation must be based on a distinction in the *product* sold to those customers. If, for example, a product is specially designed for a certain group of purchasers and the suppliers concentrate their efforts almost exclusively on those purchasers ... the product dimension may be limited to the sale of that product to those purchasers. Similarly, where one product is distinct from another because of its salability ... the relevant market can consist solely of that product.

24. Decisions of the former Fifth Circuit handed down prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v.*

*T. Harris Young & Assocs., Inc.*, 931 F.2d at 824–25. Following this logic, in *T. Harris Young*, the Eleventh Circuit Court of Appeals found that the market for EKG recording paper could not be limited to particular purchasers—hospitals with more than 200 beds—as the plaintiff proposed, because the evidence did not show a distinction between the paper sold to hospitals with more than 200 beds and the paper sold to "smaller hospitals, clinics, and doctors' offices." *Id.* at 825.

In *Heatransfer Corp. v. Volkswagenwerk, A.G.*, by contrast, the Fifth Circuit Court of Appeals held that the relevant market for automobile air conditioners was legitimately narrowed to include only Volkswagen importers rather than all purchasers of the air conditioners. *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 980 (5th Cir.1977).[24] The court reasoned that "the distinct engineering problems associated with the Volkswagen imports" meant that the *product* marketed to these importers was different from the air conditioners marketed to other purchasers of automobile air conditioners. *Id.* The court also noted that the production and sales by the producers of Volkswagen air conditioners made up the bulk of the business of those who produced the special air conditioners. *Id.*

A Supreme Court case about monopolizing the boxing promotion business also illustrates that product or service distinctions, and not purchaser characteristics *per se*, work to narrow markets. In *International Boxing Club of New York v. United States*, the Supreme Court found that the relevant market was the market for the promotion of championship boxing contests as opposed to all boxing contests because the two products were different

*City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981).

and the former was a product for which there was no substitute in the eyes of consumers. 358 U.S. 242, 250–51, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959). Because of a "particular and special demand" for championship boxing, most of its consumers would not, if prices went up in championship boxing, substitute by watching and paying for regular boxing. *Id.* at 251, 79 S.Ct. 245.

Likewise, in *Associated Radio Service Co. v. Page Airways, Inc.*, though the defendants contended "that the relevant market was the sale and installation of avionics and interiors in all turbine-powered private aircraft," the Fifth Circuit Court of Appeals upheld the jury's finding that the relevant market was instead the sale and installation of avionics and interiors in Grumman Gulfstream–II aircraft only. 624 F.2d 1342, 1349 (5th Cir.1980). This conclusion reflected that, due to their complexity and expense, avionics produced for the G–II were distinct from the broader field of avionics. *Id.*[25]

The instant Complaint presents a situation analogous to that in *T. Harris Young* and distinct from those in *Heatransfer, International Boxing*, and *Associated Radio Services*. Lockheed does not allege any distinction between the EELVs sold to the U.S. Government and those sold to commercial buyers of launch services or that the launch services needs of the U.S. Government differ substantially from those of other potential purchasers. If Lockheed had alleged that the EELVs designed for the U.S. Government were truly distinct from those designed for commercial consumers of EELVs, and that "Boeing, Lockheed and other suppliers of

EELVs concentrate their efforts almost exclusively on the U.S. Government," as required by the court in *Heatransfer*, the U.S. Government market for EELVs might be a legally sufficient proposed relevant market. Lockheed, however, does not allege this; instead, the allegations actually indicate the same EELVs that the U.S. Government buys are marketable to commercial purchasers of launch systems and services. Lockheed alleges, for example, that at the time the U.S. Government first sought bids on EELVs, all parties involved hoped to "increase the U.S. space launch industry's international competitiveness in the commercial launch services business." (Doc. 1 ¶ 11); commercial enterprises were "clamoring for additional satellite capacity" (*id.* ¶ 5); and there was a "robust commercial space launch market" (*id.* ¶ 24).

The cases Lockheed relies upon do not support its arguments that characteristics of purchasers, other than their demands, should determine the scope of the relevant market. As Boeing notes, a number of Lockheed's cases "rely upon *product characteristics—i.e.,* function, brand, or means of distribution—to define the market." (Doc. 78 at 6.) Two courts, for example, allowed narrowing of the market on the basis of distribution methods because the different methods provided distinct services and benefits to purchasers of a good. *PepsiCo, Inc. v. Coca–Cola Co.*, 98 CIV–3282, 1998 WL 547088, at *12, 1998 US. Dist. LEXIS 13440, at *38 (S.D.N.Y. Aug. 27, 1998); *FTC v. Cardinal Health*, 12 F.Supp.2d 34, 48 (D.D.C.1998). In another case, *In re Owens–Illinois*, the Federal Trade Commission defined several rele-

**25.** Lockheed also cites *National Reporting Co. v. Alderson Reporting Co.* in its argument on this issue. In that case, no court specifically addressed the allegations regarding the size of the relevant market because at the district court level the parties "basically concur[red]"

that the market should be limited to the "geographic market" of the "United States Tax Court," and the Court of Appeals passed over the issue. *National Reporting Co.*, 567 F.Supp. 1011, 1019 (E.D.Mo.1983), *rev'd on other grounds*, 763 F.2d 1020 (8th Cir.1985).

vant markets according to the distinct elasticities of demand of subgroups of purchasers, not, as Lockheed suggests, according to the purchasers' ability to turn to a greater or lesser number of suppliers of a single good they needed. 115 F.T.C. 179 (1992). Specifically, producers of some end-products (such as shelf-stable juices, liquors and spaghetti sauces) could substitute metal or plastic for their containers if glass container prices significantly rose; the "product market for the supply of glass containers for shelf-stable juices" had thus "not been established." *Id.* 115 F.T.C. at 306. In contrast, some purchasers, such as mayonnaise bottlers, could not, because of their particular needs, substitute metal or plastic for glass in the face of significant price increases in the latter. A relevant market including those purchasers thus could exclude suppliers of metal and plastic. *Id.* These delineations of separate markets based on the different capacities of consumer subgroups to substitute do not suggest that, when it is agreed that only one product (EELVs) will do for all purchasers (Government and commercial space launchers), certain purchasers of the unique product should be excluded when measuring market power. The allegations of the Complaint do not suggest that there are not "enough customers" other than the U.S. Government who can "defeat the price increase by taking their business elsewhere," so there is no suggestion that the "grouping of all [EELVs] is not a relevant product market." *Id.* at 297.

The other cases Lockheed cites for the proposition that its proposed narrowing by reference to purchaser characteristics is legitimate are also inapposite because they deal with characteristics of *suppliers* in a relevant market. *See FTC v. Imo Indus., Inc.,* No. 89–2955, 1992–2 Trade Cas. (CCH) P69,943 at P68, 558, 1989 WL 362363 (D.D.C.1989); *FTC v. Alliant Techsystems, Inc.,* 808 F.Supp. 9, 15, 18, 20

(D.D.C.1992); *Int'l Logistics Group v. Chrysler Corp.,* 884 F.2d 904, 909 (6th Cir.1989); *Fiberglass Insulators, Inc. v. Dupuy,* No. 84–1244–1, 1986 WL 13356, at *3–4, 1986 U.S. Dist. LEXIS 19711, at *9–10 (D.S.C. Sept. 30, 1986). Again, the issue is not whether suppliers of launch services other than Boeing and Lockheed are part of the relevant market but rather whether other purchasers are part of the relevant market.

Although one case Lockheed cites does seem to follow Lockheed's logic in defining the relevant market, the reasoning of that case is not persuasive. In *Dauro Advertising, Inc. v. General Motors Corp.,* an advertising agency accused defendant GM of illegally tying advertising services to wholesale sale of GM automobiles to dealerships. The court in that case began its relevant market analysis with the premise that particular buyers, GM dealerships, were adversely affected by an alleged tying program. *Dauro Adver., Inc.,* 75 F.Supp.2d 1165, 1169 (D.Colo.1999). The court then derived the definition of the relevant product—GM automobiles—by reference solely to these dealers because, it reasoned, "GM dealers have no interest in purchasing cars or trucks from any other manufacturer." *Id.* It was a mistake in that case, however, for the court to assume which purchasers make up the relevant market and then decide what the relevant product was on that basis. Determining which products make up the market is the first step. Purchasers are relevant at this initial stage only insofar as their demands govern cross-elasticity, which determines whether and which substitutes are relevant products. Other considerations serve to narrow the field only after these outer limits are defined.

The argument that, because it cannot turn to many suppliers, the U.S. Government has been or will be harmed by unfair

trade practices by one of few suppliers does not alter this analysis. The goal of antitrust law is to prevent harm to *competition*, not to prevent harm to one of many purchasers of a product: "Purchasing constraints on a single consumer, such as a required competitive bidding procedure, do not change that conclusion; the fundamental objective of our antitrust laws is to promote fair competition for the benefit of all consumers." *Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366, 368 (10th Cir.1993); *United States v. E.I. DuPont de Nemours*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The relevant market is not the U.S. government EELV market.

### b. The Worldwide Commercial EELV Market

Lockheed's complaint alternatively alleges that the relevant market is the worldwide commercial market for EELVs, and the Defendants do not quarrel with this assertion. As already noted, the Complaint repeatedly and emphatically alleges that the same EELVs that the U.S. Government buys are marketable to commercial purchasers of launch systems and services and that there was a "robust commercial space launch market." (Doc. 1 ¶ 24.) Whether Defendants are correct that the attempted monopolization claims should nevertheless be dismissed for failure to sufficiently allege that Boeing has sufficient market power is addressed below.

### 2. Market Power

Lockheed's allegations regarding the third element of an attempted monopolization claim—"dangerous probability of monopolization"—must not only propose an appropriate relevant market but must also include allegations that the plaintiff's competitor is close to acquiring controlling market power. *U.S. Anchor Mfg., Inc.*, 7 F.3d at 993. A plaintiff's allegations of a defendant's current market share are the most important factor in determining whether the market power issue should go to the jury. Generally, a showing that a defendant has between sixty and sixty-five percent market share is sufficient to present the issue of market power to a jury. *Id.* at 999–1000. Other factors, including barriers to entering the relevant market, are thereafter "relevant" to the question of market power. *Id.; Associated Radio Servs. Co.*, 624 F.2d at 1354. Lockheed's Complaint does not include any allegations about Boeing's relative share of the worldwide commercial EELV market, the minimum required to survive a motion to dismiss. *Valet Apartment Servs., Inc. v. Atlanta Journal & Constitution*, 865 F.Supp. 828, 832 (N.D.Ga.1994) (case dismissed where plaintiff failed to allege market shares of participants in relevant markets "that could support an allegation that defendants have a dangerous probability of monopolizing"), *aff'd mem.*, 50 F.3d 1039 (11th Cir.1988); *see also U.S. Anchor Mfg., Inc.*, 7 F.3d at 999–1000. The allegations are thus not sufficient to state a claim of attempted monopolization of the market that has been determined above to be the only adequate proposed relevant market, the worldwide commercial EELV market.

As noted above, the U.S. Government EELV market is not the relevant market. Defendants' arguments regarding the sufficiency of Lockheed's market power allegations as to that alternative market nevertheless merit brief discussion. Defendants argue that even if the relevant market were the narrower U.S. Government EELV market, Lockheed's allegations fail on this issue. This is not the case. Were the relevant market the U.S. Government EELV market, it would be too early to foreclose the possibility that Lockheed could prove a dangerous probability of monopolization.

Lockheed alleges that Boeing controls 75% of the U.S. Government EELV market. (Doc. 1 ¶ 223.) Defendants argue that this figure is meaningless in this case because under the EELV bidding system of fixed-price, fixed-term contracting, no contractor can achieve monopoly power, which is defined as the power to increase prices or exclude competition. *U.S. Anchor Mfg., Inc.,* 7 F.3d at 994. "No dangerous probability of monopoly power exists," Defendants argue, "because [Boeing] cannot raise the price during the contract term, and the contract can be rebid at the end of the term." (Doc. 46 at 13.) Defendants thus suggest that there is a *per se* rule that fixed-price, fixed-term bid markets can never be monopolized. Lockheed counters that such a bidding process does not necessarily preclude monopoly because factors such as high barriers of entry into the EELV market mean that Boeing's winning all of the early bids will give it control or at least a major head start in future bids.

The Eleventh Circuit Court of Appeals has stated that courts should be "wary of the numbers game of market percentage when considering an 'attempt to monopolize' suit under the dangerous probability standard." *U.S. Anchor Mfg., Inc.,* 7 F.3d at 999. Other factors, such as barriers to entry into the market like high startup costs and the advantages of experience, may be important to the ultimate decision of whether a defendant has captured a dangerous market share. *Id.; Associated Radio Serv. Co.,* 624 F.2d at 1354; *Gen. Cigar Holdings, Inc. v. Altadis, S.A.,* 205 F.Supp.2d 1335, 1351 (S.D.Fla.2002), *aff'd mem.* 54 Fed.Appx. 492 (11th Cir.2002). Lockheed does allege that barriers to entry of the U.S. Government market for EELVs make this a non-standard market. If this were the relevant market, these allegations would not be susceptible to the conclusion that Lockheed cannot allege "dangerous probability of monopolization"

because there is no *per se* rule that fixed-price, fixed-term bid markets can never be monopolized.

The cases Defendants cite to support their suggestion are not persuasive. In *Alabama Ambulance Service, Inc. v. City of Phenix City, Alabama,* for example, a district court relied on another district court case for its conclusion that a defendant, the winner of a fixed-term, fixed-cost bid contract "in open bidding against a number of other bidders ... [did] not have the power to control prices or exclude competition" and thus had no market power. 71 F.Supp.2d 1188, 1195 (M.D.Ala. 1999) (citing *Kirk–Mayer, Inc. v. Pac Ord, Inc.,* 626 F.Supp. 1168 (C.D.Cal.1986)). Both of these cases ultimately take their reasoning from an Eighth Circuit case, *National Reporting v. Alderson Reporting Co., Inc. See Ala. Ambulance Serv., Inc.* at 1195–1196 (discussing *Kirk–Mayer, Inc.,* 626 F.Supp. at 1169–71, which cited rationale of *Nat'l Reporting,* 763 F.2d 1020 (8th Cir.1985)). None of these cases supports Defendant's contention that the winner of 75% of the contracts in a fixed-term, fixed-price bidding market can *never* be shown to have dangerous market power. The decision in *National Reporting,* read in context, instead reflects that there are no *per se* rules regarding measuring market power:

> As soon as the contract goes back up for bids, *there are numerous other court-reporting companies* who can bid and try to undercut the company holding the contract. Alderson could not control prices, because if it tried to raise its price, the contract would again be up for bids. Both parties agree that Alderson could not exclude any company from bidding, and by 1980 there were several other companies capable of meeting the Tax Court court-reporting contract requirements. Competition was alive and well in the relevant market.

*Nat'l Reporting,* 763 F.2d at 1023 (emphasis added).

Reading *Nat'l Reporting* narrowly is consistent with the Eleventh Circuit Court of Appeals' emphasis on considering many factors when determining market power. *Accord* William E. Kovacic, "Mixed Signals: Recent Cases Make the Legality of Future Hospital Mergers Less Predictable," 58 *Antitrust L.J.* 1005, 1088–94 (1991) (emphasizing that "mechanical application" of relevant market and market power rules is often not appropriate in government bid cases.) Assuming, therefore, that the "U.S. Government EELV market" were the relevant market, if Lockheed could show that high barriers to entry prevent it and others from making bids in the future, that Boeing will have significant advantages over potential competitors at the end of its current fixed-term contracts, or that other factors are significant, it might be able to convince a fact-finder that there is a dangerous probability of monopolization of that market. The relevant market is *not* the U.S. Government EELV market, however, so allegations about Defendant's power in that market are irrelevant.

Because the U.S. Government EELV market is not the relevant market and Lockheed has failed to allege facts relating to Boeing's market power in the worldwide commercial EELV market, the attempted monopolization claims against all of the Defendants under the Sherman Act and the Florida Antitrust Act of 1980 are dismissed. Focus now turns to the issues raised by the claims in Counts VI and VIII alleging conspiracy to monopolize under 15 U.S.C. § 2 and section 542.19 of the Florida Statutes.

### B. Counts VI & VIII: Conspiracy to Monopolize

■ Defendants Boeing, Erskine, Satchell, and Branch all move to dismiss the antitrust conspiracy claims against them. (Docs. 46, 55, 41, & 56.) "Conspir-

acy to monopolize has three elements: (1) the existence of a combination or conspiracy, (2) an overt act in furtherance of the conspiracy, and (3) specific intent to monopolize." *Ala. Ambulance Serv., Inc. v. City of Phenix City, Ala.,* 71 F.Supp.2d 1188 (M.D.Ala.1999); *United States v. Yellow Cab Co.,* 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Levine v. Cent. Fla. Med. Affiliates, Inc.,* 72 F.3d 1538, 1555–56 (11th Cir.1996).

Lockheed alleges that Boeing, Erskine, Satchell, and Branch, "acting in concert and on behalf of Boeing," intentionally conspired to monopolize the relevant markets, and that in furtherance thereof they obtained and misused Lockheed's trade secrets and concealed these acts. Defendants argue that the conspiracy claims should be dismissed because Lockheed has failed to allege facts sufficient to support the first and the third elements of the conspiracy claims. These arguments are discussed in reverse order.

#### 1. Specific Intent: The Relevant Product Market

The Defendants maintain that this claim rises or falls with the sufficiency of Lockheed's relevant market allegations. (*See, e.g.,* Doc. 46 at 14.) Lockheed does not respond to this argument but in its Complaint Lockheed implicitly acknowledges that a relevant market showing is important to a conspiracy claim because it alleges that Defendants conspired to "monopolize the relevant markets described herein." (Doc. 1 ¶ 244.) The Court of Appeals for the Eleventh Circuit has not specifically ruled on the need to propose a sufficient relevant market for conspiracy to monopolize claims. The failure to allege facts that could support a proposed relevant product market would indeed be fatal to conspiracy to monopolize counts

under section 2 just as it is for the attempted monopolization claims.

The third element of a claim for conspiracy to monopolize requires a showing of specific intent to *achieve* monopoly power. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 995 (11th Cir.1993); *cf. Ala. Ambulance Serv. Inc.,* 71 F.Supp.2d at 1196–97 ("[W]here the alleged conspiracy, if successful, would not amount to illegal monopolization, there may be no liability for conspiracy to monopolize."). The Sherman Act prohibits conspiring to monopolize "any part of the trade or commerce," 15 U.S.C. § 2. That "part" of trade that it is illegal to conspire to monopolize is the relevant product market: "[C]ommodities reasonably interchangeable make up that 'part' of trade or commerce which section 2 protects against monopoly power." *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *U.S. Anchor Mfg., Inc.,* 7 F.3d at 995 (defining the relevant product market as made up, at the outer boundaries, of "reasonably interchangeable" commodities).

 Because monopoly power is, by definition, power over a relevant market, what constitutes the relevant market is a necessary issue in measuring a defendant's specific intent for conspiracy purposes. *U.S. Anchor Mfg., Inc.,* 7 F.3d at 995 (monopoly power is "the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market").

 Defendants' intentions with regard to the market in which the litigants compete are what concern the Sherman Act. Allegations that conspiring defendants specifically intended to drive a plaintiff from a single deal will not ordinarily support a conspiracy to monopolize claim. On the other hand, a plaintiff need not allege that the defendants conspired to drive competitors from commerce altogether. The middle ground suggested by section 2 is the requirement that the plaintiff allege that the defendants intended to monopolize a "part of trade or commerce." *See also Associated Radio Serv. Co. v. Page Airways, Inc.,* 624 F.2d 1342, 1348 (5th Cir. 1980) (noting that "the jury's finding on the extent of the market must be upheld if we are to sustain the jury's verdict finding [attempt or conspiracy] violations of [section 2] of the Sherman Act"). A plaintiff must thus allege a proper relevant market to survive a motion to dismiss a Sherman Act conspiracy claim.[26]

**26.** In a criminal section 2 conspiracy case, the Second Circuit Court of Appeals found there to be no need to allege or prove what market the defendants attempted to monopolize, but the opinion is not persuasive. The court wrote that

the charge here is conspiracy to monopolize, not monopolization. In a monopolization case the market must be proved. *See International Boxing Club v. United States,* 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270. This is because such a charge requires a showing of power to exclude competitors, and without an accurate delineation of the market, it is impossible to determine the presence or absence of this power. But where the charge is conspiracy to monopolize, the essential element is not the power, but the specific intent, to monopolize. Section 2 makes it unlawful "to conspire to monopolize 'any part' of interstate commerce," without specifying how large a part must be affected. Hence it is enough if "some appreciable part of interstate commerce is the subject" of the conspiracy. *United States v. Consol. Laundries Corp.,* 291 F.2d 563, 573 (2d Cir.1961) (internal citations omitted).

In *Consolidated Laundries Corp.,* the court contrasted conspiracy to monopolize and monopolization, but the Sherman Act provisions regarding those acts both aim to prevent control over only a "part of trade or commerce," which has been defined as the relevant product market. The court did not make clear the difference, in the context of a conspiracy

As explained above, the "U.S. Government space launch market" is not the relevant market. If Lockheed's only allegation were that Defendants conspired to monopolize that market, its antitrust conspiracy claims would fail. As already noted, however, Lockheed alleged in the alternative that Defendants conspired to monopolize the "national and international commercial space launch market." (Doc. 1 ¶ 244.) As already stated, there is nothing in the pleadings to suggest that this is not the relevant market. Lockheed has alleged, therefore, specific intent to monopolize [the worldwide commercial space launch market]." *Ala. Ambulance Serv., Inc.*, 71 F.Supp.2d at 1196; *Levine*, 72 F.3d at 1555–56. Failure to allege a relevant market is therefore not a reason to dismiss Lockheed's conspiracy claims.

### 2. The Existence of a Conspiracy

Defendants also argue, however, that the *Copperweld* intracorporate conspiracy doctrine dictates that the Sherman Act conspiracy claims against them be dismissed because no conspiracy can have existed between Boeing and the individual Defendants. Therefore, Defendants argue, Lockheed has failed to allege the "existence of a combination or conspiracy," the first element of a section 2 conspiracy claim. *Ala. Ambulance Serv., Inc.*, 71 F.Supp.2d at 1196. In *Copperweld Corp. v. Independence Tube Corp.*, the Supreme Court held that, under section 1,[27] a wholly-owned subsidiary could not form a conspiracy with its parent corporation because agreements between parents and subsidiaries "do not suddenly bring together economic power that was previously pursuing divergent goals," and these agreements are therefore not within the concern of the antitrust conspiracy statutes. 467 U.S. 752, 769, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In so holding, the Court noted that officers also cannot conspire, for section 1 purposes, with the corporations that employ them because "officers of a single firm are not separate economic actors pursuing separate economic interests." *Id.* In the Eleventh Circuit, this *Copperweld* "intracorporate conspiracy doctrine"[28] applies equally to section 1 and section 2 conspiracy claims. *Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810, 817 n. 9 (11th Cir.1990), *overruled on other grounds*, 980 F.2d 1381 (11th Cir.1993) ("*Bolt III*"). Courts in

claim, between the need to allege "dangerous probability of monopolization," which is done by defining the relevant market *and* alleging defendant's off-balance market power in that market, and the need to just allege a "relevant product market." The law is clear that alleging the "dangerous probability of monopolization" is not required to state a conspiracy claim. *Levine*, 72 F.3d at 1555–56. The plaintiff thus need not allege the defendant's relative market power—*how large* a part of the trade or commerce defendant intended to monopolize. The plaintiff must nevertheless show *what* part of the trade or commerce defendant had in mind, namely the relevant market. To hold otherwise is to hold that section 2 could support liability for conspiring to "monopolize" a single transaction. Other statutes address unfair trade practices which are illegal regardless of any larger antitrust intent. Antitrust statutes, however, cannot be interpreted without reference to their remedial goals.

27. Section 1 provides that "[e]very person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony...." 15 U.S.C. § 1 (2001); *see also* 15 U.S.C. § 15(a) (providing for a private right of action and civil damages).

28. The doctrine stated in *Copperweld* is also sometimes referred to as the "intraenterprise conspiracy doctrine." *See, e.g., Copperweld*, 467 U.S. at 783 n. 9, 104 S.Ct. 2731 (citing articles); *Bankers Ins. Co. v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 137 F.3d 1293, 1296 (11th Cir.1998). To avoid confusion with the RICO issues presented by Lockheed's Complaint, only the terms "intracorporate conspiracy doctrine" and "*Copperweld* doctrine" will be used in this discussion.

this circuit have left open the possibility of, but have rarely found applicable, an exception to the *Copperweld* doctrine. Though the doctrine applies to officers and employees acting in their official capacities, the exception might bar application of the doctrine where "the plaintiff can demonstrate that the officers of a corporation have a personal stake in achieving the object of the alleged conspiracy." *Tiftarea Shopper, Inc. v. Ga. Shopper, Inc.*, 786 F.2d 1115, 1118 (11th Cir.1986).

### a. Boeing, Erskine, & Satchell

 Erskine and Satchell were employees of Boeing during the period Lockheed claims they conspired with Boeing. No allegation suggests that any exception applies to their cases. Under *Copperweld*, Erskine and Satchell thus cannot be held liable under section 2 for actions in furtherance of a conspiracy with Boeing. The antitrust conspiracy claims against Erskine and Satchell are accordingly dismissed.

### b. Boeing and Branch

 The *Copperweld* doctrine also bars Lockheed's conspiracy claims to the extent that they stem from any alleged actions or agreements between Boeing and Branch that took place after Branch became a Boeing employee in January of 1997. Lockheed argues, however, that because it alleges the conspiracy began five or more months before Branch became an employee of Boeing, the doctrine does not bar the claim that Branch conspired with Boeing. Boeing and Branch counter that Branch was Boeing's "agent" for the whole relevant period and that the *Copperweld* doctrine bars claims of conspiracies among corporations and all of their "agents." Boeing and Branch are correct that the *Copperweld* doctrine bars the section 2 conspiracy claims against them, but this conclusion does not turn on whether Branch was an "agent" during that period.

*Tiftarea Shopper, Inc.*, upon which Boeing and Branch rely, is only the latest of a series of cases in this circuit to use "agents of the corporation" to describe the class of people with whom the corporation generally cannot conspire and to cite *Copperweld* for that proposition. 786 F.2d at 1117. Though the Eleventh Circuit Court of Appeals has often used the term "agent" when stating the doctrine, it usually has done so in the context of holding that actual *employees* of a corporation cannot conspire with the corporation, as it did in *Tiftarea Shopper*. Viewed in the context of the facts of these cases, these statements of the doctrine do not necessarily support Defendant's argument that, for Sherman Act purposes, Branch cannot have conspired during the five months before he became a Boeing employee. The Court of Appeals has never held that a non-employee who has no formal or acknowledged relationship with a corporation, like Branch during those five months, cannot conspire with a corporation for antitrust purposes.

The Court of Appeals has suggested, however, that an individual's status as an agent in the typical sense is not determinative of whether that individual falls within the *Copperweld* doctrine. The court has cited with approval a Seventh Circuit decision holding that the intracorporate conspiracy doctrine "does not preclude a conspiracy or combination between a corporation and *any agent*. The guiding principle is the requirement that there be more than one independent business entity involved in the combination or conspiracy." *St. Joseph's Hosp. v. Hosp. Corp. of Am.*, 795 F.2d 948, 956 (11th Cir.1986) (quoting *Tamaron Distrib. Corp. v. Weiner*, 418 F.2d 137 (7th Cir.1969)). The Court of Appeals' decisions therefore use the term "agent" to broadly describe entities who are not separate economic powers pursuing divergent goals from the corporation

(or other second entity) in question. The exact nature of Branch's relationship with Boeing during those five months, however, is not controlling.[29] What is important is that Branch himself was not at any time an "economic power pursuing divergent goals" from Boeing's. It is for this reason that any agreements between him and Boeing cannot be the basis for a section 2 conspiracy claim. The rationale of *Copperweld*, and not formal titles or legal relationships, determines the application of the doctrine.

Eleventh Circuit cases evaluating agreements between doctors and hospitals confirm that the purpose of the Sherman Act's conspiracy provisions is key to understanding the *Copperweld* doctrine. The Court of Appeals' statements of the doctrine's exceptions along with the general rule in these cases that courts must favor realities over form also confirm that emphasis on the Act's rationale is critical.

The decision in *Copperweld* about subsidiaries, and similar rules about employees and divisions that the Court mentioned, are not based on formal arrangements or titles but on the relative threats to competition presented by concerted activity between these entities and the corporations (or other entities) with whom they are associated. In that case, the Court wrote that, in order to properly understand whose conduct is prohibited by the antitrust conspiracy provisions, it was important to keep in mind the nature of the threat concerted activity presents to competition. The Court wrote:

Concerted activity inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands. In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit. This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction. Of course, such mergings of resources may well lead to efficiencies that benefit consumers, but their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly.

*Copperweld*, 467 U.S. at 768–69, 104 S.Ct. 2731.

The Court of Appeals sometimes states the doctrine in shorthand, stating, for example, that "an agreement among the officers of a single corporation acting in their official capacity is not a conspiracy *because a corporation cannot conspire with itself*," implying that the doctrine has its root in agency principles. *Tiftarea Shopper, Inc.*, 786 F.2d at 1118 (emphasis added). The rationale of *Copperweld*, however, makes clear that officers of a single firm cannot conspire with that firm to monopolize not *because* they are officers, and not precisely because, as agents, their acts are attributed to their principal, but because they are not divergent economic powers. *Copperweld*, 467 U.S. at 769, 104 S.Ct. 2731. Because the antitrust conspiracy statutes

29. It is not clear what the Eleventh Circuit Court of Appeals means when it uses the term "agent" in the context of the *Copperweld* doctrine. If the court means "agent" in the traditional sense of agency law, then the allegations do not precisely support Branch's falling within the doctrine. *See supra* note 11 (noting Florida definitions of agency). It would be possible to interpret the Eleventh Circuit statements of the doctrine as referring to the traditional understanding of agent, because the court frequently lists the term among other parties to specific formal relationships (employees, officers). The actual application of the doctrine in a variety of cases, and *Copperweld* itself, however, show that this interpretation would be too limited.

are only triggered when previously divergent economic powers make agreements, a plaintiff's claim must allege a "joining of two independent sources of economic power" or be dismissed.

Applying *Copperweld* in different contexts, the Eleventh Circuit Court of Appeals has made clear that the doctrine does not turn on particular legal relationships, but rather, as the Supreme Court has reiterated since *Copperweld*, "turns on specific antitrust objectives." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001). The Court of Appeals agreed, for example, with a district court holding that the executive director, counsel, and director of operations for an underwriting association could not conspire, for Sherman Act purposes, with the association which controlled them "because they lack the requisite diversity of interests...." *Bankers Ins. Co. v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 137 F.3d 1293, 1295 (11th Cir.1998). The court has also noted that "[t]he guiding principle is the requirement that there be more than one independent business entity involved in the combination or conspiracy." *St. Joseph's Hosp.*, 795 F.2d at 956 (quoting *Tamaron Distrib. Corp.*, 418 F.2d at 137).

The application of the *Copperweld* doctrine to cases in this circuit dealing with entities other than corporations and other than formal employees also makes clear that the special concerns of antitrust law determine the protective reach of the doctrine. In *Bolt III*, a physician alleged that three hospitals and members of their medical staffs who were on peer review committees had conspired to revoke his privileges at the hospitals. The court held that the defendant staff physicians—part of a hospital's staff for peer review purposes—were not within the *Copperweld* doctrine because "a hospital and the members of its medical staff ... are legally separate enti-

ties." *Bolt III*, 891 F.2d at 819. In later similar cases, the Court of Appeals refined this holding, clarifying that doctors who served on hospital staff for some hospital purposes were not *per se* within the *Copperweld* doctrine "if they are not employed by the hospital *and* are acting as separate economic actors." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1446 n. 13 (11th Cir.1991) (emphasis added); *Crosby v. Hosp. Auth. of Valdosta & Lowndes County*, 93 F.3d 1515, 1529 (11th Cir.1996). *Todorov* makes it especially clear that the *Copperweld* doctrine can protect individuals who are not employees and who are not otherwise officially associated with the larger defendant entity: the individual defendants in that case were not on the hospital's peer review committee performing "official duties," as were the individual defendants in *Bolt III* and *Crosby;* their only connection to the hospital had been to give "negative recommendations about plaintiff to the relevant peer review committees." *Crosby*, 93 F.3d at 1529 n. 19. These cases illustrate that antitrust conspiracy law targets entities such as doctors who compete with a hospital to sell medical services yet suddenly join forces with the hospital to keep other doctors out of the competition. In contrast, antitrust conspiracy law does not concern itself with an employee joining forces with his corporate employer unless the employee *himself,* the first entity, previously competed with or pursued "divergent goals" from the employer, the second entity.

The fact that the *Copperweld* doctrine does not *per se* apply to employees also highlights the importance of keeping the Sherman Act's goals in mind. In this and other circuits, when the officers or employees of a corporation "act for their own interests, and outside the interests of the corporation, they are legally capable of conspiring with their employers for purposes of" the Sherman Act. *Id.; St. Jo-*

*seph's Hosp.*, 795 F.2d at 956 (internal citations omitted).

The allegations in the instant case do not suggest that Branch *himself* ever competed with or otherwise pursued goals divergent from Boeing's. In the five months before Branch was hired by Boeing, it is true that his alleged acts cannot be said to have been in *Lockheed's* interest. His acts, however, were also not in his *own* interest as distinct from Boeing's interest, any more so than Erskine's or Satchell's acts in their official capacities were in their own distinct interests. Whether Branch was being paid by Boeing in those five months for handing over Lockheed's documents or simply doing it to impress Boeing in his hopes of obtaining employment, his interests, for antitrust conspiracy purposes, were analogous to those of any formal employee or a wholly owned-subsidiary of Boeing. Indeed, the allegations of this Complaint more than once characterize Branch as "associated with Boeing," or as acting "on behalf of Boeing." (Doc. 1 ¶¶ 178, 179.) The collusion between Branch and Boeing represented no joining of economic powers; it did not "deprive[ ] the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Copperweld*, 467 U.S. at 769, 104 S.Ct. 2731. Collusion between Boeing and Lockheed or a similar competitor would have represented a threat targeted by the Sherman Act, but collusion between Boeing and Branch, no matter how despicable, did not represent such a threat. All conspiracy claims against Branch and Boeing are accordingly dismissed.

The conspiracy allegations regarding the "others known and unknown to Lockheed Martin" are also dismissed. (Doc. 1 ¶ 243.) A district court can have no jurisdiction over "known" parties who have not been named or served with process. *Fed. R.Civ.P.* 4. In addition, both they and the unknown co-conspirators allegedly were acting "on behalf of Boeing." (Doc. 1 ¶ 243.) Assuming these people exist, they accordingly are analogous to Erskine, Satchell, and Branch and could not have conspired with Boeing under *Copperweld*. *See also Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir.1985) (finding that allegations that co-conspirators of single named defendant were "at this time unknown" to plaintiff were not sufficient to state a claim of conspiracy and did not give fair notice to named defendant).

### C. Summary

Lockheed has failed to state a claim under section 2 of the Sherman Act that the Defendants attempted to monopolize the "U.S. Government EELV market" because the allegations show that the relevant market is, as a matter of law, not so narrow. Lockheed has also failed to state a claim under section 2 that the Defendants attempted to monopolize the "worldwide commercial EELV market," which is the relevant market, because Lockheed did not allege any facts relating to Boeing's share of that market. Finally, Lockheed has failed to state a claim under section 2 that the Defendants conspired to monopolize because it has failed to allege a conspiracy among formerly divergent economic powers.

### VI. CONCLUSION

Based on the foregoing discussion, the Court rules as follows:

It is **ORDERED** and **ADJUDGED** that:

1. The Boeing Company's Motion to Dismiss (Doc. 46) is **GRANTED** as follows: Counts I—VIII, as against The Boeing Company, are **DISMISSED** without prejudice.

**1238**

2. William Erskine's Motion to Dismiss (Doc. 55) is **DENIED IN PART** and **GRANTED IN PART** as follows:

 a. As to Counts I and III (the racketeering claims), the motion is **DENIED.**

 b. As to Counts II and IV (the racketeering conspiracy claims), the motion is **DENIED.**

 c. As to Counts V and VII (the attempted monopolization claims), the motion is **GRANTED.** Counts V and VII, as against William Erskine, are **DISMISSED** without prejudice.

 d. As to Counts VI and VIII (the conspiracy to monopolize claims), the motion is **GRANTED.** Counts VI and VIII, as against William Erskine, are **DISMISSED** without prejudice.

 e. As to the motion for a more definite statement, the motion is **DENIED.**

3. Larry Satchell's Motion to Dismiss (Doc. 41) is **DENIED IN PART** and **GRANTED IN PART** as follows:

 a. As to Counts I and III (the racketeering claims), the motion is **DENIED.**

 b. As to Counts II and IV (the racketeering conspiracy claims), the motion is **DENIED.**

 c. As to Counts V and VII (the attempted monopolization claims), the motion is **GRANTED.** Counts V and VII, as against Larry Satchell, are **DISMISSED** without prejudice.

 d. As to Counts VI and VIII (the conspiracy to monopolize claims), the motion is **GRANTED.** Counts VI and VIII, as against Larry Satchell, are **DISMISSED** without prejudice.

4. Kenneth Branch's Motion to Dismiss (Doc. 56) is **DENIED IN PART** and **GRANTED IN PART** as follows:

 a. As to Counts I and III (the racketeering claims), the motion is **DENIED.**

 b. As to Counts II and IV (the racketeering conspiracy claims), the motion is **DENIED.**

 c. As to Counts V and VII (the attempted monopolization claims), the motion is **GRANTED.** Counts V and VII, as against Kenneth Branch, are **DISMISSED** without prejudice.

 d. As to Counts VI and VIII (the conspiracy to monopolize claims), the motion is **GRANTED.** Counts VI and VIII, as against Kenneth Branch, are **DISMISSED** without prejudice.

5. Lockheed Martin is **GRANTED LEAVE** to file an amended complaint within thirty (30) days of the issuance of this memorandum.

**DONE** and **ORDERED.**